**AMERICAN STATES INSURANCE CO.,**
Plaintiff,

v.

**The HANNAN CONSTRUCTION CO.**
**et al., Defendants.**

**GRANITE STATE INSURANCE CO.,**
Plaintiff,

v.

**The HANNAN CONSTRUCTION CO.**
**et al., Defendants.**

Civ. A. Nos. C 63–561, C 63–562.

United States District Court
N. D. Ohio, E. D.

Sept. 6, 1966.

990

Gerald Gold, Jerome N. Curtis, Marvin L. Karp, Cleveland, Ohio, for plaintiff, American States Ins. Co.

Robert H. Kennedy, Frank Seth Hurd, Cleveland, Ohio, for defendant, The Hannan Construction Co.

Richard C. Green, Jack Smith, Cleveland, Ohio, Jerome Goldman, Cincinnati, Ohio, for defendants, The Whitehill Co., and Giant Tiger Mansfield Drugs, Inc.

Gerald Gold, Jerome N. Curtis, Marvin L. Karp, Cleveland, Ohio, for plaintiff, Granite State Ins. Co.

## MEMORANDUM

WILLIAM K. THOMAS, District Judge.

The three defendants have individually filed motions for judgment notwithstanding the verdict and motions for new trial. On April 29, 1966 a jury rendered a verdict against defendants Hannan Construction Co., The Whitehill Company, and Giant Tiger Mansfield Drugs, Inc. in favor of plaintiff American States Insurance Company in the sum of $25,894.16. In a second case, consolidated for trial, the jury rendered a verdict against the same defendants in favor of Granite State Insurance Company in the sum of $50,152.68.

American States brought its action as the subrogee of its insured Tiger Furniture of Mansfield, Inc. to whom it paid $25,894.16 as one half the actual cash value of the merchandise and other personal property of Tiger Furniture destroyed in the fire which consumed the Giant Tiger store and its contents in Mansfield, Ohio on December 1, 1962. Similarly, Granite State brought its action as the subrogee of its insured Tiger Appliances of Mansfield, Inc. to whom it paid $50,152.68 as the actual cash value of the appliance merchandise and other personal property of Tiger Appliances that was destroyed in the fire. The Giant Tiger store, located at 1150 Park Avenue, West, Mansfield, Ohio, opened in October 1961 and continued to operate until the fire on the evening of December 1, 1962.

To evaluate the verdicts and the claims of error presented by the motions certain facts should be recounted. These facts are either admitted or are facts which the evidence permitted the jury to find. Defendant Hannan Construction Co. built the Giant Tiger store in Mansfield for defendant The Whitehill Company. On November 21, 1960 before the construction of the building, The Whitehill Company leased the entire premises for 15 years to Giant Tiger Mansfield Drugs, Inc. In the lease The Whitehill Company agreed to construct on the leased premises a stockroom "per plans and specifications drawn" by a named Cleveland architect. Giant Tiger Mansfield Drugs, Inc. agreed to use the premises as a retail store for the sale of a general line of merchandise.

The Whitehill and Giant Tiger corporations were regarded and operated by their identical management as one organization. Mr. Louis Weisberg, as president of each corporation, executed a 15-year lease from Whitehill to Giant Tiger on behalf of each corporation. The unitary nature of the enterprise is revealed in Mr. Weisberg's use of the word "we." Thus, he testified:

Well, when we wanted to have that store constructed we saw a building on Pearl Road that belonged to Shoppers Fair, and at the time we wanted the building, we wanted to have a building constructed that looked like that building.

Similarly, without differentiating between Whitehill and Giant Tiger, he used the word "we" in describing construction undertaken before the actual completion of the building. He testified:

Q All right. Now, who in your organization was charged with the responsibility of seeing to the construction of that store?

A Well, no one was in charge of seeing to the construction of the store because it was, a contract was turned over to the builder.

Q I understand that, but didn't you have some person or persons in your organization who were keeping in touch with the progress of the building of that store?

A The only reason we would be concerned about the progress of the building is so that we could arrange to have our fixtures—in those days we built our own fixtures. We, of course, purchased some and built some, and the man in charge of that was named Richard Kruser. He would be concerned when the building would be almost completed so we could start moving, start trying to get our fixtures in before the building is completely finished, so we have a little chance to open up the store a little faster. That would be the only reason.

The Giant Tiger store was a one-story retail store building constructed of face-brick, concrete block and steel, and was approximately 360 ft. across the front (east to west) and approximately 197 ft. in depth (north to south). Walls of pegboard masonite and one-quarter inch plywood (upper 16 inches) nailed on 2" x 4" studs partitioned the total floor space of 71,000 sq. ft. These partition walls divided the sales floor of 60,000 sq. ft. from storage and utility areas of 11,000

sq. ft. (6,000 sq. ft. at the east end and 5,000 sq. ft. at the west end of the store). The partition (see court's diagram attached) forming the easterly storage

Court's Diagram

area commenced at a point, here called A, 72 ft. west of the northeast corner of the building. This easterly partition then extended 19 ft. south to a point, here called B. Right angling again at point C the partition extended south 132 ft. to a point, here called D. Throughout its length, the wall CD ran 30 ft. west from and parallel to the east building wall. A store complex of offices, restrooms, and lounges occupied the southeast corner of the store adjoining the sales floor, partition CD and the south end of the easterly storage areas.

A false ceiling was suspended 13′ 8″ above the sales floor. The ceiling terminated at its juncture with the top edges of the partitions. Squares of acoustical tile, composing the false ceiling, rested on aluminum grids. These grids hung horizontally 18″ below the store roof joists to which the grids were wired. The roof joists, two feet in vertical measurement, and of open truss design, ran east to west with the top horizontal member of each roof joist resting on the upper surface of steel "I" beams. The beams, running north to south, were supported by vertical steel columns which extended from foundation to roof at 30 ft. intervals (north to south and east to west). Segment CD of the easterly partition wall followed a north-south line of column.

The building drawings and plans, were approved on March 21, 1961 by the Division of Factory and Building Inspection, Department of Industrial Relations, State of Ohio. Plan approval was contingent upon the condition that the plans "Provide ¾ hour fire protection for steel columns and roof construction." It was explained by Mr. Carl R. Daubenmire, acting chief of the Division, that ¾ hour fire protection "could be in the form of an acoustic system with a 45-minute fire rating determined by test." These plans did not designate any partitions. Yet a building drawing, subsequently dated but bearing no approval stamp, provided for partition walls and specified dry wall construction above the top of the partitions and the false ceiling.

The evidence permitted the jury to find that no dry wall was erected above the top of the partitions; that no acoustical false ceiling continued over the storage areas; and that the space above the false ceiling, referred to as the plenum space in the testimony, was not enclosed or sealed off above the partition walls. Lacking a fire resistant false ceiling the storage areas opened directly into the plenum space. The jury was entitled to find that the open plenum space provided the oxygen and up-draft which spread the "lively" fire after it commenced in the Giant Tiger paper bag storage bin behind partitions AB and BC.

The bulk of the sales floor was occupied by Giant Tiger retail departments with the remainder of the sales area leased to other retail operators. One of these, Tiger Furniture of Mansfield, Inc., leased 12,870 sq. ft. A diagram attached to the lease indicates that the demised premises were bounded 60 ft. on the north by a line which included partition segment BC (42 ft.) and by an easterly line including partition segment CD (132 ft.). With consent of Giant Tiger, Tiger Furniture sublet a portion of its space to Tiger Appliances of Mansfield, Inc. Selling the furniture and appliances designated in Tiger Furniture's sublease, Tiger Furniture and Tiger Appliances operated as one enterprise, with one sales staff serving both corporations and all customers.

The portion of the easterly storage area, between partition wall CD and the east building wall, was provided as storage space by Giant Tiger to Tiger Furniture and Tiger Appliances. The sublease specified that the providing of storage space was within Giant Tiger's "sole discretion."

On the sales floor, Tiger Furniture and Tiger Appliances displayed furniture for bedrooms, living rooms, dinettes, bedding, television sets, refrigerators, ranges, washers—so-called white goods appliances. In the storage area there were additional "mattresses and box springs, sofas, bedroom suites, washers, dryers,

refrigerators." The evidence did not identify nor value the merchandise stored by Tiger Furniture and Tiger Appliances in their storage area on the night of the fire, or displayed.

On top of the partition wall CD and visible from the storeroom side, Tiger Furniture and Tiger Appliances maintained a booster (transformer). To the booster were attached a coaxial antenna cable, and outlet wires which ran from the booster "above the false ceiling and down to the different islands where we had our sets displayed," according to Charles I. Thayer the assistant manager of Tiger Furniture and Tiger Appliances.

Merchandise for Tiger Furniture and Tiger Appliances was brought into the store through an overhead door in the northeast corner. This door was kept locked. According to store policy, whenever this door was to be opened the store security guard unlocked it; however a second key to the door lock was kept beside the door.

Abutting partition AB and the north building wall were four storage bins, described as "just framing, made of two by four's then chicken wire, two by four's with chicken wire put vertical up to seal one off from the other." Each bin was estimated to be eight feet wide and ten feet deep. Each bin had a door leading into it "made of the same material, wood two by four framing and then chicken wire over this." A door, at the south end of partition AB, connected the sales floor (drapery department, just north of Tiger Furniture's floor space) and a passageway which passed in front of the doors of the storage bins. Mr. Thayer referred to the chicken wire as "separating your bins inside of this storage area, and also it was partitioning off our storeroom at the east end of the area."

John Brady, Giant Tiger's assistant manager, explained that the first (most westerly) bin "we used for paper bags, which everyone used; the second bin we used for the fabric department; third bin for candy; [and in the] fourth one * * * we had fixtures * * * pipes,

some racks and so forth." He further stated the bags "were various sizes." There were no shelves, "they were piled one package on top of the other, they were bundled." Asked if any were loose he said, "There could have been. It would not be uncommon for people to take a handful out rather than to take the entire bundle." The bags were located against the west side of the pegboard masonite partition AB of the easterly storage area. On the opposite side of this partition draperies and drapery display were hung.

The president of Hannan Construction Co., Howard S. Young, specifically denied that these bins were constructed by his company. From all the evidence the jury was entitled to find that these bins along with counters and other fixtures were built and installed before the store opened by a joint construction crew of Whitehill and Giant Tiger, under the direction of Richard Kruser, their man-in-charge of construction; and that Giant Tiger supplied and maintained the bags and the bin after the store opened.

It was Mr. Thayer who first noticed flames. He had smelled no smoke and noticed no crackling noises. He stated that between 6:30 p. m. and 7:00 p. m. on the evening of December 1, 1962 he "happened to glance toward the pegboard partition on the north wall there and I could see a flame through the wall, through the holes in the pegboard." He ran back to the entrance door in partition AB. He stated he "opened the door, looked in and seen it was all flame, closed the door quickly, and ran by and told Mr. Wilkes to tell Mrs. Brown to call the fire department * * *" He explained that he then "ran directly to the front of the store, to the service desk, asking them to announce there was a fire in the building and for everyone to leave."

Asked whether he observed any fire in any part of the easterly section of the stockroom he testified: "I did not. The fire, as I said before, to my knowledge, was only in the north section of that stockroom." After rushing to the front

offices to get their coats he and the other employees, Mrs. Brown and Mr. Wilkes, met in the front of the store and went out. He observed that the fire was then "out into the draperies department which was directly west of the partition of the stockroom. At the front entrance door he observed that "it was getting heavy with smoke in there * * * It was practically invisible, to designate anything outside. You could see the flames through the smoke." He estimated that "it couldn't have been more than five minutes, a five-minute period" between the time he first saw the fire in the storage area in the northeast section of the store and the time he left the building. A few minutes afterward "I heard the fire department arriving after we were out on the sidewalk." He was asked:

Q Now, from what you saw when you looked in there and saw this lively blaze your judgment was to get the fire department and also to immediately clear the store?

A That was right.

Q Because, isn't it true, you knew this was out of control at this point? * * *

A I didn't know it was out of control, but I felt this: that it was at such a stage we should get out of the store.

Mr. John Kennedy of Chicago, Illinois, a fire and explosion investigator, lecturer, author, and authority on the subject, determined that the origin of the fire was evidenced by "remnants of paper bags, wire mesh, or chicken wire, and parts of fabrics." He pinpointed the spot at 10 feet south of the north wall and 65 to 70 ft. west of the east wall. This locates the origin of the fire in the most westerly bin where the Giant Tiger paper bags were stored and where the lively blaze was first noticed.

In answer to hypothetical questions Mr. Kennedy reconstructed the course and source of the fire and smoke. He stated:

* * * the fire burned upwards * * until it reached the 18½ inch aperture at which time it moved laterally throughout the entire store.

It traveled "at roof level in the 18-inch space, * * * throughout the store." The burst of window panes observed near the top of the front of the store was caused by "the heat and smoke of the fire traveling through the 18-inch roof aperture at the ceiling or false ceiling to the front of the store and causing the pressure and heat to break the windows at the front * * *" At another point he explained that:

normally dust and lint collect in the aperture and then the oxygen would hit it. This would act just like gasoline being thrown on the fire. The introduction of oxygen would be an accelerant to cause the fire to spread faster than a man could walk beneath the partition because you have an inefficient fire at the bottom generating hot air and gases with insufficient oxygen at this level because the smoke is eating it up, and all of a sudden you have oxygen.

He was asked:

Q Now, Mr. Kennedy, in your opinion once the hypothetical fire was up above the false ceiling would it be possible to save the store from destruction?

A No.

Q Why?

A Because you had preheated the entire surface of the area through which the fire went. It would have immediately heated the area underneath. You have the effect of having several separate fires, because given the temperature and providing the oxygen and materials necessary for the other fires, if a fire department got there there is no way in which they could cool that area, smother it, or put it out. They could take away any of the components but fire, once it spread through the roof, it would in my opinion be out of control of any fire department that arrived.

Asked as to whether the fire above the false ceiling would communicate to the area below the false ceiling, he answered "yes" and thus explained his answer:

When the fire travels through that area with the aluminum grids the temperature, when the oxygen was attained, the normal burning temperatures are around 1,000 to 1,100 degrees Fahrenheit. When you introduce the available oxygen supply you have increased the temperature up to perhaps as high as 2,000 degrees Fahrenheit. You immediately change the tensile strength and form of the aluminum now to the extent it buckles and drops out the ceiling portions and exposes the temperature, not so much the fire, but the temperature, to all the flammables stored beneath it.

He also stated that:

The fire would use the columns as conductors to conduct the temperature down to the flammables beneath here in the open area where there is oxygen, and the fire would have communicated by means of each of these columns.

In considering the motions for judgment which each defendant has filed it is first essential that the legal sufficiency of the evidence, here only highlighted, be tested in conjunction with the claimed negligence and the applicable law.

The cause of the fire in the Giant Tiger paper bag storage bin is unknown. The claims of the plaintiffs relate solely to the spread of the fire. Each plaintiff claims that due to the negligent acts of defendant Hannan Construction, defendant The Whitehill Company, and defendant Giant Tiger Mansfield Drugs, Inc., the fire spread through and above the acoustical ceiling and roof area engulfing the entire structure within a few minutes and completely destroying it.

Each plaintiff contends that the building was negligently constructed by defendant Hannan Construction Co. and negligently added to and altered by defendants The Whitehill Company and Giant Tiger Mansfield Drugs, Inc. in disregard and in violation of Ohio Revised Code Section 3781.06 and of the fire protection provisions of the Ohio Building Code promulgated by the Board of Building Standards of the Ohio Department of Industrial Relations pursuant to law.

Each plaintiff contends further that by reason of the claimed negligence and violations and by reason of the claimed failure of defendants to correct said violations and to comply with the Ohio Building Code, the described building was in an imminently dangerous or imminently defective condition and was inadequately protected against fire.

Ohio Revised Code Section 3781.06 was read to the jury, in part:

* * * that all public buildings which may be used as a place of trade or occupancy by the public shall be so constructed, erected, and maintained that they shall be safe for their intended use and occupancy.

A building is considered safe when free from danger or hazard to the life, safety, or welfare of persons occupying or frequenting it or of the public, whether such danger arises from the methods or materials of its construction.

The jury was told that the following sections of the Ohio Building Code (and others not here repeated) "are pertinent in connection with the claims of each plaintiff":

Section 1202.10: No building or its equipment or appurtenances * * * shall be erected, constructed, or installed except in conformity with the Ohio Building Code.

Section 1202.23: The construction, erection, and alteration of a building and and any addition thereto and the * * * maintenance thereof shall conform to any required plans which have been approved by the chief enforcement official except for minor deviations which do not involve a violation of the Ohio Building Code.

Section 1202.12 reads: No building * * * shall be so altered as to be

less safe * * * than it was before being altered, unless when altered said building * * * conform to the applicable provisions of the Ohio Building Code.

■ As to the defendant Hannan Construction Co. the jury was entitled to find that the Ohio Building Code, received in evidence, was violated in several respects. Section 1205.02, Item 9, note (f) states that "partitions shall be noncombustible or be not less in fire resistance than combustible framing protected with noncombustible materials so as to have a fire resistance rating of not less than ¾ of an hour." The evidence showed that the easterly partition wall, made of ¼″ perforated masonite and ¼″ plywood (the upper inches) attached to wood studs, had no fire resistance. On this evidence the jury was entitled to find a violation of the requirement that partitions shall be noncombustible or provide a fire resistance rating of not less than ¾ of an hour.

■ The building drawings and plans approved by the Division of Factory and Building Inspection on March 21, 1961, did not indicate partitions or storage areas. Drawing A–2 of the approved plans was superseded by a substituted plan, designated "for construction" and bearing several dates, the first being April 10, 1961. This substituted plan A–2 revealed the partitions and the storage areas, but bears no approval stamp of the Division of Factory and Building Inspection. From the evidence the jury was entitled to find that substitute drawing A–2 was never approved; and that this lack of approval violated Section 1202.23 of the Ohio Building Code, supra.

■ "Fire Stopping General Requirements" are provided in Section 1203.33 of the Ohio Building Code. In part these read:

Concealed and draft openings in the framing and other parts of the buildings shall be effectively fire stopped to prevent the spread of fire laterally and from one story to another through such openings * * *

The evidence permitted the jury to find that the plenum space above the false acoustical ceiling was a concealed draft opening and space, that this plenum space was not fire stopped, and that fire stopping would have been accomplished by vertically extending dry wall constructed of ¾ hour fire resistant materials to the roof and by horizontally installing a fire resistant acoustical false ceiling above the storage areas all the way to the building walls. The jury was further entitled to find that the failure to fire stop the plenum space and the failure to continue a fire resistant acoustical ceiling to the building wall specifically ignored the plan approval contingency that there be ¾ hour fire protection for the roof construction. The jury was entitled to find that these omissions violated the foregoing requirement of the Ohio Building Code.

The vertical steel columns were not covered with any fire resistant material. The jury was entitled to find that this violated Ohio Building Code Section 1203.024 which provides in part that "Columns shall be individually protected to have the required fire resistance rating throughout their lengths; * * * * " Approval of the building plans was based on the contingency that the columns be construction from the top of the partiterial. The jury could find that this contingency was not complied with.

From the verdict for the plaintiff against the defendant Hannan Construction Co. it may be presumed that the jury found that defendant Hannan failed to comply with one or more of these pertinent requirements of the Ohio Building Code, thereby failing in its statutory obligation to erect and construct the Giant Tiger building "in conformity with the Ohio Building Code."

In regard to the defendants Whitehill and Giant Tiger the jury was entitled to find from the evidence, particularly from that previously highlighted, that Whitehill and Giant Tiger, acting jointly, constructed the storage bins made of chicken wire and wood two-by-fours, including

the Giant Tiger paper bag bin in which the fire started.

As indicated by one witness, the jury was entitled to find that these framings and walk-in doors of chicken wire and wood two-by-fours separated the storage bins inside the storage area, and partitioned them off from the stockroom of Tiger Furniture and Tiger Appliances. From all the evidence the jury was entitled to conclude that these separations, the construction of which was attributable to both Whitehill and Giant Tiger, were each "a minor interior wall used to subdivide a floor area." Proceeding further the jury was entitled to find that these separations were partitions within the meaning of Section 1201.06 of the Ohio Building Code; and that as partitions they were required by Ohio Building Code Section 1205.02, Item 9, note (f) to be noncombustible or to have a "fire resistance rating of not less than ¾ of an hour." The Code definition of partition was applicable rather than the Code definition of fire partition since the word partition appears in Section 1205.02, Item 9. However, the jury might also have found that these partitions served as fire partitions by subdividing "the floor area of the building * * * to restrict the spread of fire" (as defined).

The need for contained and protected storage bins was inferable from their actual construction, with provision made for locking each of the four bins. Because of the general use of the Giant Tiger bags the bag bin was apparently often unlocked. The evidence does not indicate and does not permit a contrary inference that the paper bags, flammables and other bin contents would have been openly piled or stacked in the north storage area, had the fenced-in bins not been constructed.

The verdict against the defendants Whitehill and Giant Tiger warrants the presumption that the jury found that these separations constructed of chicken wire and wood two-by-fours, patently lacking in fire resistance violated the Ohio Building Code; and that Whitehill and Giant Tiger rendered the building less safe than it would otherwise have been, by the construction of bins intended for the storage of paper bags and other flammable materials without separating and protecting the bins with fire resistant materials.

■ The requirements of the Ohio Building Code so far described are contained in the Code's Administrative and General Regulations, being Chapters 1201 to 1223, 1225, and 1230, and apply to buildings of varying use and occupancy, including "Business buildings." Chapter 1239 relates solely to business buildings. Business buildings "include mercantile buildings and office buildings", and mercantile buildings include "department stores * * * spaces used for retail or wholesale sales, and buildings of similar use." Clearly the Giant Tiger building was a mercantile building. As Division Chief Daubenmire testified: "This occupancy chapter (Chapter 1239) governs the construction of mercantile buildings."

Section 1239.19 of the Ohio Building Code which was introduced in evidence provides that:

Interior walls and partitions shall have a fire resistance of not less than that specified under the provisions of Chapters 1203 to 1208, inclusive, OBC which are applicable to the type of construction required for the building, and not less than is required as follows:

\* \* \* \* \* \*

(F) Storage and service rooms, enclosures—section 1239.35 OBC

Section 1239.35 required:

Storage rooms, building service equipment rooms, and work rooms where combustible or flammable materials are stored or used, or where a fire hazard is caused by equipment, shall be separated from other parts of the building as specified in Table 1239.35
\* \* \*

Under Table 1239.35 for applicable Type II–A & II–B Noncombustible building the fire resistance of the enclosing construction was two hours when the build-

ing, as here, did not have a sprinkler system.

Two fires occurring at Giant Tiger Mansfield demonstrate the need for and aid in understanding the point and purpose of Section 1239.35. A week or so before the December 1, 1962 fire, a fire occurred on the sales floor. Robes on one side of a rack in the ladies' clothing area caught fire. The fire was extinguished before it spread. The fire on December 1, 1962 commencing in the storage bin, located behind the partition, was not observed until it apparently mushroomed out of control. Combustible materials stored out of sight in a storage area in a mercantile building, purposely and wisely, are required by Section 1239.-35 of the Ohio Building Code to be kept in a separate fire resistant storage room to prevent the spread of any fire which might start, spontaneously or otherwise, in stored combustibles.

Under Section 1239.19 and 1239.35 of the Ohio Building Code the jury was entitled to find that defendants Whitehill and Giant Tiger were required to separate the storage of paper bags and other flammable materials from "other parts of the building" by "enclosing construction" of two hours fire resistance. The jury was warranted in concluding that the four side-by-side storage bins constituted a storage room for combustible or flammable materials. Constructed of non-fire resistant materials the storage bins (room) did not comply with the two-hour fire resistance requirement of Section 1239.35 of the Ohio Building Code.

The particular pertinence of Section 1239.35 to the construction of the storage bins by defendants Whitehill and Giant Tiger was not perceived until the study of the present motions. Though not presented in the court's charge to the jury as pertinent sections of the Ohio Building Code, Chapter 1239 (including 1239.19 and 1239.35) was received into evidence. The jury's verdict permits the presumption that the jury may have considered and applied these sections. As part of the evidence considered by the jury these sections should also be considered in determining the sufficiency of all the evidence and the motions for judgment pressed by defendants Whitehill and Giant Tiger.

In overruling the motions for directed verdict it was ruled that Ohio Revised Code Section 3781.11 should not be construed to provide that violations of the Ohio Building Code "constitute a public nuisance and * * * liability without fault." Later the jury was instructed to consider whether "any one or more of the * * * sections of the Ohio Building Code has been violated by any one or more of the defendants." Consistent with the ruling on the motions for directed verdict the jury was told that "should you find any violation to have occurred you may consider such violation *not* as negligence in and of itself." (emphasis added) However the jury was charged:

* * * you may consider any such violation as evidence in connection with the negligence claimed against the particular defendant found to have violated said section of the Ohio Building Code.

The case was submitted to the jury with the underlying instruction that "As here explained and circumscribed each of the defendants was under the duty of exercising ordinary care with reference to the property of Tiger Furniture of Mansfield, Inc. and Tiger Appliances of Mansfield, Inc."

The jury was then informed that:

Ordinary care for each of the Defendants is that degree of care which a reasonably prudent person, engaged in the business of said Defendant would exercise under same or similar circumstances.

The duty of ordinary care was then particularly defined for each defendant. First as to defendant Hannan Construction it was said:

With respect to the claim of negligence, and the only claim of negligence which is made against Defendant Hannan Construction Co., the pertinent duty of ordinary care imposed on a

builder in the construction of a building is limited to the duty of refraining from creating an imminently dangerous or imminently defective condition, concealed from and unknown to subsequent users of said building, including any tenants or sub-tenants.

Moreover a builder is not relieved from his duty to exercise ordinary care in the construction of a building, by virtue of any inspection made of or any approval given to the construction of the building by a state or local building inspector.

Next as to defendant Whitehill it was stated:

With respect to the claim of negligence, and the only claim of negligence, which is made against the Defendant Whitehill Company, the duty of ordinary care imposed on the owner of a building as to any alteration or addition to the building which he performed is to refrain from creating an imminently dangerous or imminently defective condition, concealed from and unknown to subsequent users of said building, including lessees and sub-lessees.

This duty does not cease when the owner leases the entire building but continues even though the owner no longer has control over the building.

However other than the foregoing duty an owner out of control of leased premises has no duty with reference to any subsequent users of the building, whether lessees, or sub-lessees, or others.

As to a similar claim of negligence against defendant Giant Tiger, the jury was told:

With reference to the claim of negligence made against Defendant Giant Tiger Drugs of Mansfield, Inc., the duty of ordinary care imposed on the lessor of an entire building as to any alteration or addition to the building which the lessor performs is to refrain from creating an imminently dangerous or imminently defective condition, concealed from and unknown to users of the building including any of the lessor's tenants or sub-tenants.

Not material to the present discussion is the further instruction that in addition with reference to any portions of the building over which the lessor retains and exercises control, the lessor had the duty of exercising ordinary care to keep the premises reasonably safe for users of the building, to give notice hereof, and in correcting or removing any dangerous or defective structural condition in the building.

Accordingly, as to each defendant the jury was charged that the duty of ordinary care imposed on the defendant "is to refrain from creating an imminently dangerous or imminently defective condition, concealed from and unknown to users of the building." This is the basic claim of negligence against each defendant that was submitted for the jury's consideration.

The words "imminently dangerous or imminently defective condition" used in qualifying each defendant's duty of ordinary care, were defined for the jury to mean:

* * * that a structure is either imminently dangerous by its very nature; or they may mean that though not dangerous by its very nature and safe to be used for the purpose intended when properly constructed, the building contains a defect or defects which render the building dangerous when applied to its intended use in the usual and customary manner.

Proof that a building is in an imminently dangerous or defective condition requires a finding that it might be reasonably anticipated that harm to persons cr property would probably result from the very nature of the building or from any acts or omissions which occurred in constructing, altering, or adding to the building when the building was thereafter applied or used in the intended, usual, or customary manner.

Defendant Hannan Construction Co., as building erector, and defendants

Whitehill and Giant Tiger, which companies the jury was entitled to find jointly altered the building after its erection, were all charged with knowledge pursuant to Ohio Revised Code 3781.06 that the Giant Tiger building was required to be "so constructed, erected \* \* \* and maintained that [it] shall be safe \* \* \* for [its] intended use and occupancy \* \* \*" Moreover, to make the building safe the same section charged these defendants with knowledge that the building must be "free from danger or hazard to the life, safety, health, or welfare of persons occupying or frequenting it, or of the public \* \* whether such danger arises from the methods or materials of its construction \* \* \*" Reasonably construed, this language contemplates protection from danger or hazard of the property, as well as the persons, of those "occupying or frequenting" the building.

Those erecting or altering the Giant Tiger building were further charged with the duty to comply with the requirements of the Ohio Building Code, promulgated by the Ohio Board of Building Standards to render each public building safe and free from danger.

Under all the evidence it appears that defendants Whitehill and Giant Tiger might reasonably anticipate that "an imminently dangerous or defective condition" would be created by building and installing non-fire resistant storage bins in which combustible materials might ignite and the fire might spread beyond the bins to other parts of the building. Defendants Whitehill and Giant Tiger also might have reasonably anticipated that this dangerous condition would have been avoided had fire resistant partitions with a fire resistance of two hours (or even ¾ of an hour) been used in the construction of the storage bins to resist the spread of fire for that period of time.

The evidence likewise permits a finding that Hannan Construction Co. might reasonably anticipate the creation of an "imminently dangerous or defective condition" through a failure to fire stop and enclose the false ceiling plenum space with appropriate fire resistant construction, through a failure to cover the storage area with fire resistant acoustical ceiling, in the use of partitions of perforated masonite and ¼" plywood totally lacking in fire resistant qualities, and through a failure to insulate the store's 44 steel columns with fire resistant materials. As an erector of buildings, chargeable with knowledge of the provisions of the Ohio Building Code, defendant Hannan Construction Co. might reasonably anticipate that a fire originating in the storage area might be fed and fanned by the oxygen and up-draft supplied by the open plenum space above the partitions, and that a fire in the storage area which enters the false ceiling plenum space would quickly travel and spread through the plenum to all parts of the store with harm to persons or property probably resulting. Defendant Hannan Construction Co. might reasonably anticipate that fire and flames spreading through the plenum space would engender sufficient heat to buckle the aluminum grids and thereby cause fire to penetrate the acoustical ceiling and to pass down the uninsulated columns, reaching combustible materials on the sales floor.

Furthermore, sufficient evidence must exist to permit the jury to find that the claimed "imminently dangerous or defective condition" was "concealed from and unknown to users of the building."

Though Tiger Furniture and Tiger Appliances and their employees had no business reason to enter the stock area where the bags and other merchandise were stored, the evidence indicates that employees of Tiger Furniture and Tiger Appliances knew that Giant Tiger paper bags were stored in the most westerly storage bin behind the partition walls AB and BC. The evidence also indicates that Tiger Furniture and Tiger Appliances, through the use of their TV booster, cable, and wires above the false ceiling, and through the knowledge of

their employees, had knowledge of the 18″ open plenum space above the partitions and false ceiling.

Nevertheless, it does not follow that knowledge of these several facts charged Tiger Furniture and Tiger Appliances as a matter of law that it should have known and reasonably foreseen that the potentially-dangerous and defective conditions existing in portions of the building beyond their demised premises would disastrously cause a fire which had started in Giant Tiger's paper bag bin to spread to and destroy Tiger Furniture and Tiger Appliances merchandise in their stockroom and on the sales floor.

It is not shown that Tiger Furniture and Tiger Appliances had knowledge of the "fire triangle" described by Mr. Kennedy as having three component parts of "something that will burn", "temperature above the kindling temperature of the material" and "oxygen." It is not shown that these retail concerns had knowledge or might reasonably anticipate that a fire starting in the Giant Tiger paper bag bin would send up hot vapors of a sufficiently high temperature to kindle lint and other flammable particles in the oxygen-laden air overhead in the open plenum space above the false ceiling, a reconstruction of the fire which entered this record through the opinions of Mr. Kennedy, an expert witness.

■ Performing no alteration of the building (under the sub-lease this would have been prohibited), and not engaged in the construction business, Tiger Furniture and Tiger Appliances would have no actual knowledge of the requirements of the Ohio Building Code applicable to the Giant Tiger building. Nor does the evidence compel a finding that as a matter of law these companies should know of, or reasonably anticipate the devastating spread of fire which would eventually result from violations of the Ohio Building Code by the defendants.

■ ■ There was sufficient evidence to submit for the jury's consideration the plaintiffs' claims of an "imminently dangerous or defective condition, concealed from and unknown to the users of said building" including Tiger Furniture and Tiger Appliances. For precisely the same reasons it is concluded that Tiger Furniture and Tiger Appliances did not as a matter of law assume the risk of conditions existing outside of their demised premises. Assumption of risk, treated as an affirmative defense, was submitted to the jury under instructions deemed appropriate.

■ ■ In the claim of negligence against each defendant submitted to the jury the basic duty of ordinary care was delimited to the duty of refraining from creating an imminently dangerous or imminently defective condition, concealed from and unknown to subsequent users of said building. Expressed in the principle of law recognized and declared in Restatement of the Law of Torts, Section 385 (1934). This section states:

> One who on behalf of the possessor of land erects a structure or creates any other condition thereon is subject to liability to others within or without the land for bodily harm caused to them by the dangerous character of the structure or condition after his work has been accepted by the possessor under the same rules as those stated in §§ 394 to 398, 403 and 404 as determining the liability of one who as manufacturer or independent contractor makes a chattel for the use of others.

Though Section 385 speaks only of bodily harm, the use of these words is not understood to limit the application of this principle of law to injury to person. No logical reason is perceived why its application should be so limited. The principle is applicable to injury to property as well as to person. Ohio Revised Code Section 3781.06 states that "a building is considered safe when free from danger or hazard to the life, safety, health, or welfare of persons occupying or frequenting it or of the public * *." Use of the term "welfare of persons" and the manifest public purpose sought to be served by Ohio Revised Code Section 3781.06 et seq. and by the Ohio Building Code require that these sections be in-

terpreted to protect property as well as persons from injury.

Ohio courts acknowledge the effectiveness of the rule stated in Restatement of the Law of Torts, Section 385 under which the erector of a structure or creator of any other condition on land, is subject to liability even after his work has been accepted by the possessor of the land. Mudrich v. Standard Oil Company, 153 Ohio St. 31, 40, 90 N.E.2d 859, 864 (1950) (dissenting opinion of Judge Hart); Sumner v. Lambert, 96 Ohio App. 53, 121 N.E.2d 189 (1953). After quoting Section 385, the Court of Appeals (Montgomery County) in *Sumner* observed,

> that this principle of law is analogous to the principle of law fixing liability on a manufacturer of an article which is of a dangerous character, which fact is unknown to the user. Id. at 63, 121 N.E.2d at 195.

In Foley v. Pittsburgh-Des Moines Co., 363 Pa. 1, 68 A.2d 517 (1949), the Supreme Court of Pennsylvania considered whether the company which had erected the liquified natural gas tanks on the premises of East Ohio Gas Company could be liable for damages suffered in the explosion of the tank (the East Ohio Gas fire and explosion of October 20, 1944) some 11 months after the completion of the tank and the acceptance of the tank by East Ohio Gas Company. Applying Ohio law the Supreme Court of Pennsylvania determined that Ohio courts follow the doctrine of MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050, L.R.A.1916F, 696 (1916), and that the principle applies to realty as well as to chattel. Ohio, the court assumed "would follow along the same legal pathways as the courts of other States." Indeed it has, as *Mudrich* and *Sumner* reflect.

On motion for directed verdict during the trial it was determined that Section 385 of Restatement of the Law of Torts should be recognized as the controlling Ohio rule. Deemed superseded by the passage of years this court declined to follow Williams v. Edward Gillen Dock, Dredge, and Construction Co., 258 F. 591,

594 (6th Cir. 1919) and its old general principle that:

> subject to certain exceptions * * * after the contractor has turned over the work and it has been accepted by the owner, the contractor incurs no further liability to third persons by reason of the condition of the work * * *.

The earlier conclusion is affirmed that Section 385 of Restatement of the Law of Torts, rather than *Williams*, correctly reflects the present law of Ohio on this subject.

The motions for judgment further urge that the evidence on the issue of proximate cause is not sufficient to present a question to the jury and requires judgments to be entered in favor of the defendants. In support of this phase of the motions defendant Hannan Construction Co. argues:

> Plaintiffs, also offered evidence tending to prove that the fire spread through the building as a proximate result of the Building Code violations. From that point on plaintiffs' case fails * * * It is difficult to imagine how the evidence could have been more clear that plaintiffs' goods in the storage area would have been damaged whether or not the Building Code requirements had been met. There was no fact issue for the jury to determine and this defendant respectfully submits that it is entitled to judgment notwithstanding the verdict of the jury.

Similarly, defendants Whitehill and Giant Tiger argue:

> An examination of the record indicates that some merchandise belonging to the plaintiffs in the storage area would have been damaged regardless of how the building was erected, within any applicable provisions of the Ohio Building Code.

After reciting at length from the testimony of Mr. John Kennedy, defendants Whitehill and Giant Tiger conclude:

> By reason of this uncontradicted evidence that some of plaintiffs' merchandise would have been destroyed in the

storage area to-wit, mattresses, paper-cartoned furniture, etc., the court erred in submitting the issue of damages to the jury, and should have directed a verdict for the defendants.

In advance of the July 25th oral hearing on these motions the court submitted this question to counsel:

Does the Kennedy testimony together with the remaining evidence entitle reasonable men to find, had the eastern storage area been constructed so as to give it complete 45-minute fire resistance, that the fire would have been extinguished without damage to any of the stored merchandise of Tiger Furniture and Tiger Appliances?

At the hearing considerable attention was paid by the court and counsel to this claim of error jointly presented by the defendants. Since the hearing, sufficiency of the evidence on the issue of proximate cause has been exhaustively examined, in relation to the Kennedy testimony and in connection with the entire record.

The review of Mr. Kennedy's testimony reveals that he was asked numerous questions as to the spread of a fire starting in the Giant Tiger paper bag bin assuming construction of the building in compliance with the Ohio Building Code in which fire resistant materials, rated for ¾ of an hour, vertically enclosed the false ceiling plenum space above the partitions, horizontally extended the false ceiling over the entire storage area, and replaced the non-fire resistant perforated masonite and plywood partitions which formed the easterly storage area. On these assumptions the net of his testimony is that the fire would have been built up and died down where it started or it would have spread laterally, "there being nothing to stop it." Had it spread to the entire easterly storage area he agreed that it would have consumed the combustible merchandise of Tiger Furniture and Tiger Appliances.

Asked what would stop the fire, he mentioned "the arrival of the fire department within the ¾ of an hour" (the period allotted by the fire resistant ma-trials). In extinguishing the fire under then existing circumstances (including access by the fire department through the partially forced open overhead door) there would be nothing to indicate that the merchandise would have escaped smoke and water damage.

At no point was Mr. Kennedy asked to predict the course of the fire had defendants Whitehill and Giant Tiger, in accordance with the Ohio Building Code, partitioned the four storage bins with ¾ hour fire resistant materials or constructed a separate storage room for combustibles with two-hour fire resistance, and had the fire started in the paper bag bin under such assumed circumstances. Yet his testimony at several points, together with all the evidence, would justify the jury in finding that, given full compliance by all the defendants with the Ohio Building Code, the fire starting in the Giant Tiger paper bag would have there consumed itself and died down.

The jury was entitled to conclude that had the four storage bins been enclosed with fire resistant partitions or had there been a separate fire resistant storage room, and with a false ceiling above the four storage bins constructed of fire resistant material, and if the open plenum space had been fire-stopped, then there would have been no overhead supply of oxygen and up-draft to feed and fan the fire, and there would have been no lateral spread of the fire beyond the storage bins or storage room. In the words of Mr. Kennedy:

hot air and rising temperatures will go directly up, in the absence of any air currents laterally or any flammables laterally.

Pertinent too is this opinion of Mr. Kennedy:

It would be easy to extinguish a fire of paper bags or fabrics. That is not a hot fire. The difficulty here was the oxygen which would be like gasoline when it got into the plenum space.

During the trial this court did not fully perceive the applicability of Section

1239.35 (Ohio Building Code) to creation by defendants Whitehill and Giant Tiger of the four storage bins. Accordingly, an objection was sustained to a question that inquired as to the spread of the fire assuming that "this partition wall constructed with materials in such a manner as to have a fire resistance of two hours rather than a fire resistance of ¾ of an hour." Mr. Kennedy's answer proffered by plaintiff reads:

> In my opinion it would have confined the fire to the area in which it originated, and it would not have spread throughout the aperture in the roof or throughout the wall into the other portions of the store.

This question referred to the partition wall of the easterly storage area. However, it may be presumed from Mr. Kennedy's proffered answer that had the question related to a storage room wall of two-hour fire resistance constructed to store combustibles he would have similarly answered that the fire would have been confined to the "area in which it originated."

In determining whether there was sufficient evidence to submit the issue of proximate cause to the jury the proffered answer of Mr. Kennedy must now be taken into consideration.

In any event, the evidence in the record entitled the jury to conclude that full compliance with the Ohio Building Code by defendant Hannan Construction and by defendants Whitehill and Giant Tiger would have resulted in confinement of the fire to the storage bin in which the fire originated. With the fire confined to the storage bins it would not have spread laterally to consume or damage the furniture of Tiger Furniture and Tiger Appliances in the stockroom along the east building wall.

Thus, on the issue of proximate cause there was sufficient evidence to permit the jury to find that negligence of the three defendants combined to cause Tiger Furniture's and Tiger Appliances' loss of merchandise in their stockroom as well as on the sales floor.

Further in support of its motion for judgment defendant urges that the plaintiffs (Tiger Furniture and Tiger Appliances) failed to comply with Section 1202.13 of the Ohio Building Code which requires that "buildings * * * shall be maintained so as to comply with the Ohio Building Code * * *" It is also urged that the sub-lease of Tiger Furniture obligated the sub-lessee to maintain the premises in accordance with law.

The "imminently dangerous or imminently defective condition, concealed from and unknown to the users of the building", previously elaborated upon, existed in and above the easterly storage area. The storage area and the overhead area above the false ceiling were not part of the demised premises of Tiger Furniture and Tiger Appliances. Only with the exercise of the discretionary power expressly reserved to Giant Tiger were Tiger Furniture and Tiger Appliances permitted to store merchandise in the stockroom between partition CD and the easterly building wall. Giant Tiger exclusively controlled, and therefore under Section 1202.13 of the Ohio Building Code was required to maintain, the store premises located north and east of the demised premises of Tiger Furniture and Tiger Appliances.

A related point is asserted in support of the motions for judgment of defendants Whitehill and Giant Tiger when they argue that the "evidence shows as a matter of law that complainants' subrogor assumed the risk of damage by remaining in possession with knowledge of defects in the premises." As previously noted, the demised premises did not include the "imminently dangerous or imminently defective condition" which the jury was entitled to find directly and proximately caused the entire loss of merchandise of Tiger Furniture and Tiger Appliances. Masterson v. Atherton, 149 Conn. 302, 179 A.2d 592 is not controlling. For that case applied the following principle, not here pertinent:

> Ordinarily, a tenant takes the demised premises as he finds them, and the landlord is not liable for defective con-

ditions (that is, conditions making the premises not reasonably safe for the reasonably to be anticipated uses which the tenant would make of them) within the demised area.

The final point to be considered in connection with the motions for judgment relates to Paragraph XIV, an exculpatory clause in the sub-lease of Giant Tiger to Tiger Furniture. Accordingly, defendant Giant Tiger alone asserts this claim of error.

During the trial, Paragraphs IX and X as well as Paragraph XIV were withdrawn from consideration by the jury, and hence were physically deleted from the sub-lease (xerox copy) which was sent to the jury as an exhibit.

Paragraph IX was found to be immaterial to the trial issues. It provides that the:

Lessee will * * * comply with and observe the Workmen's Compensation Laws of Ohio and will indemnify, protect and save harmless the lessor from and against liability loss or expense from any default or failure of the lessee in such compliance and from and against liability to any employee or employees of lessee, unless said injury is caused by Lessor, and/or employees of Lessor.

Paragraph X provides:

Lessee shall indemnify and hold harmless lessor * * * from any claim of liability of whatsoever character arising out of or resulting from lessee's exercise of any rights or privileges hereunder, and lessee shall procure a comprehensive general liability policy insuring the lessor and lessee against any loss or liability for damages which might result from lessee's operation at or from the demised premises * * *.

Paragraph X is immaterial since this language in effect indemnifies the lessor Giant Tiger from any claim of liability "arising out of or resulting from" the lessee Tiger Furniture's negligence.

Paragraph XIV provides:

Lessor shall not be responsible to lessee for damage to or the theft of any goods, wares, merchandise or personal property of any kind stored, kept, maintained or displayed on said premises by lessee, or any damage, injury or loss to any person or property whatsoever, in, on or about the premises, or any part thereof.

In support of its motion for judgment on this point defendant Giant Tiger urges that Paragraph XIV supplements Paragraphs IX and X and serves to exculpate lessor Giant Tiger from its own primary negligence. Thus, the argument is that:

Having clearly excluded the lessor's own primary negligence from the exculpatory provisions of paragraph IX, it is obvious that the parties knew and intended that the lessor's own primary negligence was covered by the wording of paragraph XIV, or else lessor's own primary negligence would have been similarly excluded in this paragraph also, or better still, the entire paragraph would have been deleted from the lease, as it could have no other purpose.

Comparison of these paragraphs discloses that Paragraphs IX and X are save harmless clauses supplementing each other. Paragraph XIV, on the other hand, is an exculpatory clause in which lessor Giant Tiger does not seek indemnity but seeks to exonerate itself from responsibility for damage to property or persons. Is the responsibility, sought to be exonerated, the primary negligence of the lessor? This purpose is not expressed in Paragraph XIV. May exculpation from Giant Tiger's possible negligence be inferred?

■ Giant Tiger Mansfield Drugs, Inc. was a discount department store operated as part of the successful and growing Giant Tiger chain of discount stores. Now of general knowledge it may be judicially recognized that the success of a discount store depends on many customers, lower prices, volume sales, rapid turnover of merchandise, lower margin of profits, and lower costs of operation per unit of sales.

The ratio of sales clerks per total customers is therefore much lower than in an ordinary department store. Self-service sales counters are substituted for counters attended by sales clerks. Unattended sales counters necessarily permit greater temptation for theft of merchandise and increase the opportunity for uncontrolled customer handling and damage of merchandise.

Paragraph XIV provides that "Lessor shall not be responsible to lessee for damage to or the theft of any goods, wares, merchandise or personal property of any kind stored, kept, maintained or displayed on said premises by lessee * * *". Giant Tiger Mansfield Drugs, it will be recalled, was composed of sales departments of its own together with some leased departments. With many customers of Giant Tiger sales departments circulating through the entire store, it is evident that there was a serious risk that some of these customers might damage or pilfer some merchandise, for example, portable TV sets which Tiger Furniture or Tiger Appliances had on display on the sales floor. This portion of Paragraph XIV may reasonably be construed as an exoneration of lessor Giant Tiger from responsibility for any damage or theft of merchandise of Tiger Furniture or Tiger Appliances.

The latter provision of Paragraph XIV seeks to free the lessor from responsibility for "any damage, injury or loss to any person or property whatsoever, in, on or about the premises, or any part thereof." Again bearing in mind the large number of customers who pass through the departments of large discount stores such as Giant Tiger, it is perceived that the incidence of injury to such persons or damage or loss to their property may be a real and serious risk of operation of such a store. Persons claiming injury to person or property occurring on or about the premises of Tiger Furniture may file a claim or bring a suit against Tiger Furniture. By the latter language of Paragraph XIV it appears that Giant Tiger is seeking to exculpate itself from any responsibility to Tiger Furniture for any claims or suits which persons claiming injury to person or property on or about the premises of Tiger Furniture may bring against Tiger Furniture. Giant Tiger is telling Tiger Furniture do not expect indemnification for any loss you may suffer through such claims or suits. We are not responsible.

■ Thus reasonably construed, Paragraph XIV, read alone or in conjunction with Paragraphs IX and X, neither compels nor permits the inference that the purpose or effect of Paragraph XIV is to exculpate the lessor Giant Tiger from the consequences of its own negligence, occurring beyond the demised premises of Tiger Furniture.

Nor is the language of this exculpatory clause sufficiently similar to the language of the indemnity agreement in General Accident Fire & Life Assur. Corp. v. Smith & Oby Co., 272 F.2d 581, 77 A.L.R.2d 1134 (6th Cir. 1959) to regard *Smith & Oby* as here controlling.

*Smith & Oby* held that the indemnitee was saved harmless from its own negligence under an agreement which embraced "all loss, expense, damages, claims, suits or subrogations resulting from injury * * * arising from *any cause or for any reason whatsoever* in or about the premises where the work is performed." [emphasis added.] No such language of causation is included in Paragraph XIV of the lease involved in the instant case. In the absence of language which all-inclusively includes "loss, expense, damages, claims, suits * * * arising from any cause or for any reason whatsoever" Paragraph XIV will not be construed to exonerate lessor Giant Tiger from the results of its own negligence.

For another reason Paragraph XIV should not inferentially be construed to exculpate lessor Giant Tiger from its own negligence. To do so would thwart the public purpose of Ohio Revised Code Section 3781.06 which seeks to make buildings "free from danger or hazard to the life, safety, health, or welfare of persons occupying or frequenting it or of the public", and of the related Ohio Building

Code and its purpose "to provide minimum uniform standards for construction and construction materials to make buildings safe and sanitary for their intended use and occupancy." By private agreement parties should not be permitted to ignore and to circumvent the public responsibility and public policy clearly expressed by the Ohio Legislature and the Ohio Board of Building Standards in the foregoing laws and regulations having the force of laws. Nor is the legislative declaration of public policy lessened because this court has construed violations of the Ohio Building Code to be evidence of negligence, but not absolute nuisance nor negligence per se.

Accordingly, in so far as defendant Giant Tiger seeks to apply Paragraph XIV to free itself from responsibility for its own negligent acts or omissions, Paragraph XIV is deemed unenforceable and against public policy. Compare Paulco, Inc. v. Howard A. Schneider, Inc., Ohio Court of Appeals, Lucas County C.A. 5668, Jan. 28, 1963 and Kuzmiak v. Brookchester, Inc., 33 N.J.Super. 575, 588, 111 A.2d 425 (1955). In the latter case the court ruled:

> Although it may be primarily a prerogative of the Legislature to declare exculpatory contracts in landlord and tenant relationships to be contrary to public policy, the courts may also do so.

Upon consideration of each claim of error in support of the motions for judgment each claim of error is overruled and the motions for judgment filed and pressed by each defendant is overruled.

Motions for new trial are also filed by each defendant.

■■■ Principally these motions assert prejudicial error in the court's charge. Defendant Hannan Construction, after the conclusion of the court's charge but before the jury retired to deliberate, requested

> the court to charge that as a matter of law the jury may not speculate as to the amount of damage, and if they find some or part of the damage was not due directly and proximately to the

negligence of any of the Defendants, of each or any of the Defendants, the verdict must be for the Defendants.

This request is a timely compliance with Rule 51 of the Federal Rules of Civil Procedure which requires that "whatever the form of the objection it must at least state distinctly the matter to which objection is taken and the grounds for the objection." Bertrand v. Southern Pacific, 282 F.2d 569, at 572 (9th Cir. 1960).

To the foregoing request the court responded:

> I think, Mr. Hurd, I am going to rely on the language which I used, and I think that the substance you are asking has been given, and I do think if I were to give it now at the tail end of the charge it would unduly emphasize this point. I do believe it has been covered in different ways throughout the charge and respectfully overrule your request.

In the instructions to the jury there is no specific charge "that the jury may not speculate as to the amount of damage."

However, language to the same sense and effect was given in the general charge. This language was added to the general charge as a result of a request made by Mr. Hurd, counsel for the defendant Hannan Construction Co. Prior to the jury argument a conference was held in chambers in which the proposed jury instructions on the issues were read by the court to counsel and discussed with counsel. These added instructions, based on Gedra v. Dallmer Co., 153 Ohio St. 258, 91 N.E.2d 256, 17 A.L.R.2d 453 (1950) were designed to explicitly inform the jury that the possibility of damage was not enough, but rather, that the plaintiffs must produce evidence excluding the effectiveness of other possible causes for which the defendant was not responsible. The following language was given to the jury:

> It is not sufficient for Plaintiffs to prove that the negligence of one or more Defendants might have caused certain damage to Plaintiffs. If the

loss complained of might well have resulted from one of several causes, it is necessary that the Plaintiffs produce evidence which will exclude the effectiveness of any cause for which Defendant is not legally responsible.

That is, if the cause of loss to the Plaintiffs may be as reasonably attributed to an act for which a Defendant is not liable, as to an act for which the Defendant is liable, then the Plaintiffs have not sustained their burden of showing that their loss was a proximate result of any negligence of the Defendant.

The instruction requested by counsel for defendant Hannan Construction at the completion of the general charge further reads:

and if they find some or part of the damage was not due directly and prox-- imately to the negligence of any of the Defendants, or each or any of the Defendants, the verdict must be for the Defendants.

The sense and effect of this instruction is incorporated in the instructions given in connection with the issue of proximate cause. The issue of proximate cause (the SECOND ISSUE) is introduced as one of proximate causal relationship between the negligence of the defendants and "the spread of the fire and loss or damage to the *entire* stock of merchandise and personal property." To the same sense and effect are the instructions which summarized the issue of proximate cause in these words:

If from a preponderance of all the evidence you find that either or both Plaintiffs has failed to prove that the negligence of any of the Defendants directly and proximately caused the spread of the fire and the entire loss or damage of either or both of the insureds of the Plaintiffs, then you would decide the second issue in favor of the Defendants and you would return a verdict for each of the Defendants.

But if from a preponderance of all the evidence you find that either or both of the Plaintiffs has proved that negli-

gence of any Defendant directly or proximately caused or substantially contributed to the spread of the fire and the entire resulting loss or damage of either or both of the insureds of the Plaintiffs, you would then decide the second issue in favor of said Plaintiff.

A reconsideration of the instruction requested at the end of the general charge verifies the reasons given in refusing to submit the further instruction. It is concluded that in declining to supplement the general charge no error prejudicial to the defendants was committed.

 Defendant Hannan Construction makes two other claims of error relating to the court's charge and defendants Whitehill and Giant Tiger make an additional claim of error. In none of these instances was there compliance with the requirements of Rule 51. These claims of error, now raised for the first time, have not perfected the necessary grounds of error.

 Whether or not the "plain error" exception to Rule 51 is recognized or followed in the Court of Appeals for the Sixth Circuit is not clear. See Sucher Packing Co. v. Manufacturers' Cas. Ins. Co., 245 F.2d 513, 518 (6th Cir. 1957). In view of this uncertainty each instruction, unchallenged during the trial but now claimed to be prejudicially erroneous, will be reviewed to determine whether any "plain error" is involved.

It is stated by defendant Hannan Construction that:

This Court charged the jury at page 16 of the charge, that defendant Hannan had the duty of "Refraining from creating an 'imminently dangerous' or imminently defective condition * * *".

It is then argued that:

this was improper and prejudicial because it imposed a greater duty than that required by law. This defendant did not have an absolute duty to refrain from creating "an imminently dangerous" condition. Defendant's duty was less. Defendant's duty was to exercise ordinary care in the con-

struction of the building and to exercise ordinary care in refraining from creating an imminently dangerous condition.

Read in context, the instructions complained of impose no absolute duty. Rather, it applies and limits the duty of ordinary care imposed on the defendant Hannan. The full instruction to the jury appears supra at pages 15 and 16. Accordingly, "plain error" is not established.

■ Error is further asserted with reference to the following paragraph of the court's charge on the issue of proximate cause:

Furthermore, should you find that it is reasonably probable that any merchandise and personal property of Tiger Furniture or Tiger Appliances stored in the easterly storage area would have suffered loss or damage, even if the fire had been entirely confined to any part or all of said storage area and irrespective of whether or not any one or more of the Defendants was negligent as claimed, then you would decide this second issue of proximate cause in favor of the Defendants.

It is urged that "The charge of the Court in this particular had the effect of shifting the burden of proof to defendant on this issue." However, only 82 words after the foregoing paragraph appears, the issue of proximate cause was summarized. As seen from this language, previously quoted on pages 31 and 32 of this opinion, the burden of proof was not shifted to the defendants but was correctly placed on the plaintiffs.

The words which are said to have the effect of shifting the burden of proof on the issue of proximate cause introduce the paragraph by stating:

Furthermore, should you find that it is reasonably probable * * *

In civil cases the law deals with probabilities, and findings of juries necessarily are based on probabilities. This particular paragraph recites a set of facts and conditions which, if found by the jury and therefore reached upon a reasonable probability), would require that

the jury decide the issue of proximate cause in favor of the defendant. Thus, this instruction supplements the other instructions on the issue of proximate cause. It neither is intended to deal with, nor does it alter, the burden of proof on this issue.

Here too, "plain error" did not occur.

■ Immediately following this paragraph, a balancing instruction was given. First exception to this instruction was taken by counsel for defendants Whitehill and Giant Tiger at the oral hearing on these motions held on July 25. No objection was previously raised by any defendant to this instruction. It reads:

However, should you find that any merchandise and personal property of Tiger Furniture or Tiger Appliances stored in the easterly storage area suffered loss or damage in the spread of the fire directly but only by reason of negligence of one or more Defendants, acting alone or in conjunction with other causes, then such negligence, if established, would be a direct and proximate cause of said loss or damage, and you would decide the second issue in favor of the Plaintiffs.

In retrospect it appears that either the words "and all" should have been inserted after the word "any", or the word "entire" should have been substituted. Thus changed, the paragraph would commence "However, should you find that any [and all] merchandise", or "However, should you find that the [entire] merchandise."

Had this omission been called to the court's attention when this paragraph was read to counsel before jury arguments began, a correction would quickly have been made. This instance illustrates how application of the requirements of Rule 51 would avoid inadvertent mistakes such as the court's failure to insert the words "and all" after the word "any."

The instructions summarizing the issues of proximate cause immediately follow the paragraph under discussion. In these summarizing paragraphs the words

"entire loss or damage" is employed in the first paragraph, and the words "the entire resulting loss or damage" is used in the next paragraph. Since the jury was immediately told that the "entire loss" must be directly and proximately caused by the negligence of any defendant for the plaintiff to prevail on the second issue, it is concluded that the earlier inadvertent reference to "any merchandise and personal property" is not plain (presumably prejudicial) error.

Other errors asserted in the several motions though not expressly mentioned in this opinion have been examined. To the extent these errors were considered and ruled upon in connection with the motions for directed verdicts the conclusions there reached are affirmed. These additional claims of error in support of the several motions are denied.

Respectfully the motions for judgment and the motions for new trial are individually overruled.