# United States Court of Appeals
## For the First Circuit

No. 03-2324

GETTY PETROLEUM MARKETING, INC., and
GETTY PROPERTIES CORPORATION,

Plaintiffs, Appellees,

v.

CAPITAL TERMINAL COMPANY and
DUNELLEN, LLC,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. Mary M. Lisi, U.S. District Judge]

Before

Lynch and Lipez, Circuit Judges,
and García-Gregory, District Judge.*

Gerald J. Petros, with whom Charles J. Blackman, Hinckley,
Allen & Snyder, LLP, and Duffy & Sweeney, Ltd were on brief, for
appellants.
James W. Ryan, with whom Robert K. Taylor and Partridge, Snow
& Hahn, LLP were on brief, for appellees.

December 10, 2004

_____

* Of the District of Puerto Rico, sitting by designation.

**Per Curiam**.  This case requires us to determine whether appellant Capital Terminal Company was entitled to reach a jury on its claim that certain improvements to a fire suppression system were required by "regulations" under the terms of its written agreement with appellee Getty Properties Corporation.  At the conclusion of appellant's case, the district court granted appellee's motion for judgment as a matter of law because, in the court's view, appellant had failed to establish a basis for instructing the jury on the content of such regulations, and hence could not link the required improvements to those regulations.  We affirm.

## I.

Appellant Capital Terminal Company (Capital) owns the Wilkesbarre Pier (the Pier) in East Providence, Rhode Island.  The Pier is used primarily for offloading petroleum -- mostly gasoline and home heating oil -- from barges and deep water vessels.  Two pipelines begin on the Pier and extend approximately 2.5 miles to a pair of underground oil terminal facilities located in East Providence.[1]  Capital owns one of the underground terminals; appellee Getty Properties Corporation (Getty Properties) owns the other and leases it to Getty Petroleum Marketing, Inc. (Getty

_____

[1]The parties dispute ownership of these pipelines.  However, the issue of ownership of the pipelines is not before this court on appeal.

-2-

Marketing).  Getty Properties also owns a usage interest in the Pier.

An Operating Agreement executed in 1975 governs the parties' relationship regarding costs associated with the Pier.  In 1997, a dispute arose over the nature and extent of repairs to the Pier.  As a result of this dispute, the parties, including Getty Properties and Capital's predecessor in interest, agreed to a First Amendment to the Operating Agreement.  That amendment provides that Getty Properties is responsible for "[t]he cost of compliance with all City, State, or Federal regulations applicable to the operation of the pipelines."  The term "regulations" is not defined in the Operating Agreement or the First Amendment to the Operating Agreement.[2]

Before 1992, the closest source of pressurized water to the Pier was a hydrant located on neighboring property owned by the Union Oil Company of California (Unocal).  In the event of a fire, water from the hydrant would have been used to spray fire-retardant foam onto the pipelines.  In 1992, the East Providence Water Department shut off water to the hydrant because it was concerned that chemicals from Unocal's operations might contaminate the water supply.  This action left the Pier without sufficient ability to

_____

[2]Hereinafter, we refer to the Operating Agreement and the First Amendment to the Operating Agreement collectively as "the Agreement."

suppress a fire on the pipelines.  The parties that used the Pier began to discuss this problem as early as 1994.

In 1997, the East Providence Fire Department contacted Capital about the lack of a pressurized water supply on the Pier. Beginning in 1998 and continuing until 2000, Capital attended a series of meetings (the Advisory Group meetings) at the Coast Guard's Marine Safety Office.  At these meetings, representatives of Capital, Unocal, the Coast Guard, the State Fire Marshal's Office, and the East Providence Fire Department discussed how best to provide adequate fire suppression services to the Pier.  A representative of Getty Marketing also attended several of the Advisory Group meetings.  The parties dispute whether the representative of Getty Marketing also represented Getty Properties.

On May 8, 2000, Capital wrote a letter to Gerald A. Bessette, Chief of the East Providence Fire Department, setting out a proposal for fire suppression at the Pier.  It included four specific measures: extension of an existing water main to the Pier, purchase of a mobile Foam Tote Trailer that the Fire Department could use to suppress a fire anywhere in the city, installation of a radio signal alarm box at the Pier, and purchase of a portable chemical fire extinguisher to be housed at the Pier.  The letter stated that "[t]he estimated total cost for the four . . . improvements is approximately $200,000."  It appears that Capital

anticipated paying for these improvements, as the letter stated that "[t]his amount is a major expenditure for [Capital], and represents a hardship, above which we cannot extend ourselves."

On May 12, 2000, the Advisory Group, including representatives of both Capital and Getty Marketing, as well as Chief Bessette, discussed Capital's proposal. The minutes from the meeting state that "[a]ll of the key players agreed to the following proposal (summarized) . . . submitted by Capital." The proposal listed in the minutes included all four measures outlined in Capital's May 8, 2000, letter, plus the additional measure of installing a pipeline from the head of the Pier to a separate manifold area of the Pier.

On May 17, 2000, Chief Bessette sent a letter to Capital, Getty Marketing, and Getty Properties, stating that "[a]s a result of a number of [Advisory Group] meetings . . . in regard to a lack of adequate fire protection at the Wilkesbarre Pier, the following are minimal acceptable improvements to that facility." The letter then listed the five improvements that the Advisory Group had agreed upon during its May 12, 2000, meeting. Shortly thereafter, Capital demanded that Getty Properties pay for the cost of implementing the improvements listed in Chief Bessette's letter, contending that those improvements were required by "regulations" under the terms of the Agreement between the parties.

On August 2, 2000, Getty Properties and Getty Marketing sought a declaratory judgment from the district court that they were "not obligated to install a water line or fire suppression system for the pier." On September 8, 2000, Capital filed a compulsory counterclaim seeking $300,000 to cover the costs of the fire suppression system that it had already begun to install. The district court divided the trial into two phases. In phase one, the court tried Capital's counterclaim before a jury.[3] In phase two, tried at a later time, the court conducted a bench trial to address Getty Properties's and Getty Marketing's declaratory judgment action.[4]

During the jury trial, Capital introduced into evidence the historical documents governing interests in the Pier, including the Agreement between Capital and Getty Properties obligating Getty Properties to pay "[t]he cost of compliance with all City, State, or Federal regulations applicable to the operation of the pipelines." Capital also introduced a report written by Orville Slye, a consultant hired by Capital to assess the fire suppression needs on the Pier. That report had been presented to the Advisory

---

[3]Phase one also included Getty Marketing's claim that Capital had breached a separate agreement -- the "Throughput Agreement" -- by failing to make certain repairs to the Pier. That claim is not before us on appeal.

[4]Phase two also included other claims by Getty Properties and Getty Marketing that are not relevant to the issues on appeal.

Group and had been used by Capital in developing its proposal for fire suppression on the Pier. Capital also introduced the minutes of the Advisory Group meetings.

At the close of Capital's case, Getty moved for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a)(1). Getty argued that "[t]here has been absolutely no testimony here regarding any particular regulation or any rule of law that Getty Properties did not comply with." This statement somewhat misstates the issue that was before the court. The issue was not whether Getty Properties had failed to comply with any regulation or rule of law. Rather, the issue was whether the improvements listed in Chief Bessette's letter were required in order to comply with "regulations" as that term was used in the Agreement, and therefore whether Getty Properties was responsible for paying the cost of installing those improvements.

In response to this motion, the court pressed Capital to "point [the court] to the regulation which requires the installation of the fire suppression system that you seek compensation for." Capital directed the court to R.I. Gen. Laws § 23-28.22-5,[5] which with an exception not relevant here, states:

_____

[5]In June 2004, Rhode Island repealed R.I. Gen. Laws § 23-28.22-5 and other portions of Chapter 23 as part of an overhaul of its fire safety laws. See 2004 R.I. Pub. Laws 225. However, to properly address whether the improvements listed in Chief Bessette's letter of May 17, 2000, were "regulations," we refer to Rhode Island law as it existed at the time of that letter, that is, the provisions in effect in 2000.

"The construction, installation, use, storage, and maintenance of facilities storing, using, and dispensing flammable and combustible liquids within the scope of this chapter shall be in accordance with N.F.P.A. Standard 30, 1987 edition." Capital asserted that the 1987 edition of the National Fire Protection Association Standard 30 (NFPA 30), a "Flammable and Combustible Liquids Code" developed by a nongovernmental entity, was incorporated into Rhode Island law pursuant to R.I. Gen. Laws § 23-28.22-5, and thus constituted a "regulation" for the purposes of the Agreement.[6]

The court asked Capital where the regulation was and Capital responded, "I can get a copy, I suppose." When asked whether it was introduced into evidence, Capital responded, "It's a matter of law, your Honor." The court continued to push Capital, stating, "Show me the Rhode Island Building Code which you say has force of law," to which Capital responded, "I don't have the

---

[6]R.I. Gen. Laws § 23-28.22-1 governs the applicability of R.I. Gen. Laws § 23-28.22-5. It provides that the provisions of Chapter 28.22 ("Flammable and Combustible Liquids") "shall not apply to existing buildings, plants, structures, or equipment now used for flammable liquids unless the enforcing officer shall determine that the conditions constitute a distinct hazard." R.I. Gen. Laws § 23-28.22-1(b). The record indicates that the pipelines in this case qualify as "existing buildings, plants, structures, or equipment." However, the district court found that, "[g]iving [Chief Bessette's letter] the most generous reading that I can and drawing all reasonable inferences in favor of Capital Terminal," Chief Bessette had determined that the lack of a fire suppression system on the pier was a distinct hazard. The district court therefore determined that "the flammable and combustible liquids chapter of the Rhode Island General Laws does apply."

building code." The court articulated its belief that the Standard should be part of Capital's papers in the case.

The court then asked for the citation. Capital responded, "It is NFPA 30 and the Rhode Island Building Code, your Honor, and I will find it and bring it to you, I promise, or at least I should say I will find it and try to bring it to you." The court stated that the violation of a regulation was the "bedrock of [Capital's] claim against Getty" and that it was Capital's "obligation as the party pressing the claim not only to set forth the facts that support [the] claim but to set forth the law." The court observed that Capital had not cited a specific provision of NFPA 30 that required the introduction of the fire suppression equipment, let alone given the court a copy of NFPA 30:

> [Y]ou rested, but you have not directed me to any specific regulation. . . . But I'm asking you to give me a copy of the regulation that you say supports your argument on this point. Because if it's not there . . . you will lose on this claim. It's as simple as that.

Noting that it had looked unsuccessfully for NFPA 30, the court took a short recess to give Capital time to obtain a copy.

After a recess, the court asked counsel for Capital whether he was "able in the recess to identify a specific statute, ordinance, regulation, anything that specifically covers the fire suppression system that we've been talking about[.]" Capital simply offered R.I. Gen. Laws § 23-28.22-5; counsel admitted that

he had a 2000 edition of NFPA 30 but not the 1987 edition.  The court stated:

> The problem I have is this.  This statute makes reference to a document.  It is not incorporated, that is, the text of the document is not incorporated into the statute.  There is nothing before this jury from which it can make a determination that Getty had an obligation to comply with certain provisions.

The court noted that Slye, Capital's expert, never stated what was required by NFPA 30; in fact, he stated that his own recommendations exceeded NFPA 30's requirements.  The court continued to press Capital:

> Where is there anything in the record other than the reference to this standard or set of standards that addresses the precise issue in this case. . . . All you have is the reference.

The court then commented ominously on the significance of NFPA 30's absence from the case: "Nobody knows what it says at this point, but most importantly the jury and I do not know what it says."  Capital responded that the court was confusing issues of law with issues of fact:

> It's not a question of fact, your Honor.  This is a question of law . . . .  [Y]our Honor wouldn't give [the jury] the statute.  Your Honor would, I suspect, charge as to what the law is.  If your Honor believes that NFPA 30 is now the building code law of the State of Rhode Island, I would expect you to charge that.  I believe that if I had tried to offer either the General Laws or [NFPA 30] in evidence, that an objection would have been made and sustained.  It's a matter of law.

The court was not convinced by Capital's argument, noting, "I'm not so sure . . . . But I think you've got a hole in your case."

Capital continued:

> The point of the matter is that this is now a matter of law. We will submit a memorandum at the earliest possible time, and it will be quickly, to show you what NFPA 30 is and that it is the law and ask you to charge the jury accordingly.

The court reminded Capital, "I need the '87 version," and asked, "Who's got it?" Although counsel offered to get a copy of the 1987 edition of NFPA 30, the court said it was "too late" and admonished that "[i]f this is what your client is hanging its hat on, this is something that should have been provided to the Court a long time ago, not now."

The district court granted Getty Properties's motion for judgment as a matter of law.[7] In reaching its conclusion, the court probed the nature of NFPA 30. The court noted that NFPA standards were promulgated by the National Fire Protection Association, which is a private industry board. From an evidentiary standpoint, the court believed that because the private standard was not incorporated into the text of the state statute, but rather was simply referenced, Capital was required to introduce NFPA 30 into evidence. The court believed that the problem with

---

[7]The jury trial continued on Getty Marketing's claim that Capital had breached the "Throughput Agreement." On December 19, 2002, the jury found in favor of Getty Marketing and awarded damages of $100,000.

-11-

Capital's case was that, "even taking all of the [evidence introduced at trial] into account, there is absolutely not one shred of evidence in the case linking the [recommendations of Chief Bessette] to the 1987 edition of NFPA 30."

In its written order of December 20, 2002, the court further explained its decision, stating the "dispositive issue" was "whether there was any evidence that the items listed in Chief Bessette's letter were in accordance with the standards set forth in NFPA 30, 1987 edition." The court noted that "[t]he NFPA 30, 1987 edition manual was never offered as an exhibit, and is not part of the evidence in this case." It further stated that "the only testimony concerning what was or was not required on the Pier in the way of fire protection equipment came from Orville Slye, Jr." The court added that the recommendations in Slye's report, by the report's own terms, exceeded "minimal, non-mandatory, fire protection recommended by NFPA 30." The district court concluded that "[n]owhere does the Slye Report indicate that the recommendations contained therein are in accordance with the NFPA 30, 1987 edition. Moreover, the report does not state that recommended Pier improvements are required by statute, ordinance, or any regulation whatsoever."

In the absence of evidence linking the improvements listed in Chief Bessette's letter to the requirements of NFPA 30, the court determined that no reasonable jury could find that those

improvements were required by "regulations." The court stated that "[n]owhere in Chief Bessette's letter does he reference a Rhode Island state statute, city ordinance, or other regulation requiring installation of the listed items, nor does he mention the NFPA 30, 1987 edition or state that the items listed are in accordance with NFPA standards." The court concluded that "the failure to make an evidentiary link between items listed in Chief Bessette's letter with a corresponding regulation is fatal to plaintiff's claim."[8]

---

[8]On June 23, 2003, the court proceeded to phase two of the trial. At the conclusion of phase two, it ruled that Getty Properties had failed to prove that it was _not_ obligated to install a fire suppression system on the Pier. Capital contends that the district court's grant of Getty Properties's Rule 50 motion in phase one of the trial is inconsistent with its ruling against Getty Properties in phase two of the trial. There is no necessary inconsistency in these two rulings. The Rule 50 motion argued only that Capital had not introduced sufficient evidence to demonstrate that the improvements listed in Chief Bessette's letter were required by "regulations." That ruling, however, did not require the district court to hold, in phase two of the trial, that Getty Properties had met its burden to demonstrate that it was not obligated to install a fire suppression system on the Pier. In its phase two decision, the court explained that its ruling in phase one of the trial (addressing Capital's counterclaim) had not decided Getty's declaratory judgment claim on the merits:

> As the party seeking the declaratory judgment, Getty [Properties] had an obligation to come forward with evidence that established, for instance, that the installation of the fire suppression equipment on the Wilkesbarre Pier is _not_ required by city, state, or federal regulation, or, in other words, that it has no obligation to install such equipment on the Pier. In this, it failed.

On appeal, Capital argues that a reasonable jury could have found that the improvements listed in Chief Bessette's letter were required by "regulations." Capital's primary arguments are that (1) the court should have taken judicial notice of the contents of NFPA 30 because NFPA 30 is part of Rhode Island law and thus the judge was responsible for instructing the jury as to its requirements, and (2) the evidence at trial indicated that the improvements in Chief Bessette's letter were required by the regulatory authority of the City of East Providence, the State Fire Marshal, and the Coast Guard.[9]

---

[9]Capital also argues that it was "ambushed" by Getty Properties's Rule 50(a) motion because Getty Properties had admitted in its pleadings that the improvements listed in Chief Bessette's letter were "required." In its Second Amended Complaint, Getty Properties states:

> Through its Fire Chief, the City of East Providence has indicated that there is inadequate fire protection on the Pier and has set forth certain minimum requirements for necessary improvements to the Pier or else the Pier will be closed.

Capital over reads the statement, which does not admit that the improvements listed in Chief Bessette's letter were required by "regulations." The statement just acknowledges the obvious fact that the Chief required the improvements. Moreover, Capital did not raise this "ambush" argument before the district court until phase two of the trial, well after the court had ruled on Getty Properties's Rule 50 motion. Therefore, even if the "ambush" argument had any validity, it has been forfeited. See, e.g., Violette v. Smith & Nephew Dyonics, Inc., 62 F.3d 8, 10 (1st Cir. 1995).

"We review the grant of a motion for judgment as a matter of law de novo." McLane, Graf, Raulerson & Middleton, P.A. v. Rechberger, 280 F.3d 26, 39 (1st Cir. 2002). In ruling on Getty Properties's Rule 50(a) motion, the district court held that the jury could not decide whether "Getty [Properties] had an obligation to comply with certain provisions" of NFPA without a copy of NFPA 30 being presented.

The contract language at issue provides that Getty Properties is responsible for "[t]he cost of compliance with all City, State, or Federal regulations applicable to the operation of the pipelines." Although the word "regulations" is not defined in the contract, the word unmistakably means that Getty Properties is only responsible for the cost of improvements required by city, state, or federal law.[10]

We deal quickly with Capital's second argument that independent of NFPA 30, the evidence introduced at trial permitted a jury to find the improvements were required by city, state, or federal regulations, and thus Getty was liable for the cost of the improvements to the Pier. That is simply not so. Even Capital's expert did not testify to that effect, but rather said the plan

---

[10]The district court opinion confirms that "[t]he parties do not dispute that the term 'regulation', which is not defined in the Operating Agreement, refers to a rule or order having the force of law."

exceeded the NFPA recommendations. Indeed, Capital's main argument, then and now, turns on the assertion that the Rhode Island statute which references NFPA 30 requires the improvements made to the Pier and is the regulation which, under the Agreement, makes Getty responsible.

We now turn to this argument. Capital contends that the court should have determined the requirements of Rhode Island law pursuant to its responsibility to determine the law applicable to the case, and then instructed the jury on those requirements. Since Rhode Island law provides that "facilities storing, using, and dispensing flammable and combustible liquids within the scope of this chapter shall be in accordance with N.F.P.A. Standard 30, 1987 edition," R.I. Gen. Laws § 23-28.22-5 (emphasis added), Capital argues, NFPA 30 is part of the law of Rhode Island and hence, as argued in its brief, "[i]t was never [Capital's] obligation to prove what the law is." Capital maintains the court was obligated to take judicial notice of the law, in this case, NFPA 30. Although counsel did not use the words "judicial notice" in his argument before the district court, we will take it, in his favor, that the court understood his request in those terms.

We disagree, however, that the court was required to take judicial notice of NFPA 30. After Getty moved for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a)(1), the court asked Capital for a copy of NFPA 30, referenced in Rhode Island General

Laws § 23-28.22-5. The court indicated that it had looked for a copy and was unable to locate one. After a brief recess, Capital still could not provide the court with a copy; Capital simply pointed to the Rhode Island statute that referenced the standard. On appeal, Capital's argument is that the court was required to take judicial notice of NFPA 30, regardless.

Generally, in the federal system, "[t]he law of any state of the Union, whether depending upon statutes or upon judicial opinions, is a matter of which the courts of the United States are bound to take judicial notice without plea or proof." Lamar v. Micou, 114 U.S. 218, 223 (1885); White v. Gittens, 121 F.3d 803, 805 n.1 (1st Cir. 1997). Municipal ordinances and private codes referred to in statutes historically have not been included within this general rule of judicial notice of law. Under traditional rules, even a municipal ordinance must be put into evidence. See Gardner v. Capital Transit Co., 152 F.2d 288, 290 (D.C. Cir. 1945)(affirming trial court's refusal to take judicial notice of or instruct the jury regarding a District of Columbia ordinance that appellant had not proven, because "municipal ordinances may not be judicially noticed by courts of general jurisdiction"); Robinson v. Denver City Tramway Co., 164 F. 174 (8th Cir. 1908)("[T]o make [an ordinance] available in establishing a charge of negligence, it must be pleaded, like any other fact of which judicial notice will not be taken."); Town of Lincoln v. Cournoyer, 186 A.2d 728, 730

(R.I. 1962) ("It is generally held that the doctrine of judicial notice will not be extended to the enactment of specific municipal ordinances or to the specific provisions of such municipal ordinances."); 2 John Strong, <u>McCormick on Evidence</u> § 335 (5th ed. 1999)("Private laws and municipal ordinances . . . are not commonly included within the doctrine of judicial notice of law and these must be pleaded and proved."); 9 Wigmore, <u>Evidence</u>, § 2572 (Chadbourn rev. 1981) ("[O]rdinances and regulations of <u>local government boards</u> and councils are usually not noticed.").

We do not know if the court would have taken judicial notice of NFPA 30, if Capital had provided the district court with an appropriately certified copy of the 1987 version of it. But Capital chose not to do so (and apparently did not itself have the correct version of the Standard). Nor was NFPA 30 readily available.

Indeed the court informed Capital that it had tried to find the correct version and had been unsuccessful. Even those courts which have more liberally construed the rules of judicial notice as to local ordinances and codes do so only when the law to be noticed is readily available and there are no issues about accuracy or authenticity. <u>See</u> <u>Melton</u> v. <u>Oklahoma City</u>, 879 F.2d 706, 724 n.25 (10th Cir. 1989)(taking judicial notice of matters when they are not subject to reasonable dispute and the accuracy cannot be questioned); <u>Newcomb</u> v. <u>Brennan</u>, 558 F.2d 825, 829 (7th

-18-

Cir. 1977) (noting that city ordinances can be judicially noticed because they fall within the category of "common knowledge").  That is the opposite of this situation.[11]

The court's conclusion that Capital's case failed for lack of an essential element of the case was correct, and the court properly entered judgment as a matter of law for Getty, pursuant to Fed. R. Civ. P. 50(a)(1).  Accordingly, we **<u>affirm</u>** the decision of the district court.  Costs are awarded to Getty.

**(Concurrence follows.)**

---

[11]At least one member of the majority has reservations about the analysis set forth in the concurring opinion.

**LIPEZ, <u>Circuit Judge</u>, concurring.**  Although I concur in the per curiam opinion of my colleagues affirming the decision of the district court, I write separately to discuss the doctrine of judicial notice of law generally, some important changes taking place in the application of that doctrine to municipal ordinances and mandatory safety codes, and the relevance of those changes to the judicial notice request made by Capital in this case. Recognizing that this discussion is not precedent, I nevertheless hope that the discussion will inform the judicial notice of law analysis when comparable judicial notice of law issues arise in future cases.

**I.**

**A.      Judicial Notice Generally**

To assess Capital's contention that the district court was required to take judicial notice of NFPA 30, I first distinguish two concepts lumped together under the rubric of judicial notice: judicial notice of <u>fact</u> and judicial notice of <u>law</u>.  Judicial notice of fact is an evidentiary shortcut.  It permits facts in a particular case to be established without proof by admissible evidence if they are "not subject to reasonable dispute" by virtue of being "either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose

-20-

accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).[12]

For example, if it is necessary to establish that an offense took place within the special maritime and territorial jurisdiction of the United States, the court may take judicial notice that the site of the offense was, in fact, federal property. See United States v. Bello, 194 F.3d 18, 26 (1st Cir. 1999) (trial court did not err in taking judicial notice that a certain prison was within exclusive federal jurisdiction).

Judicial notice of law is the name given to the commonsense doctrine that the rules of evidence governing admissibility and proof of documents generally do not make sense to apply to statutes or judicial opinions -- which are technically documents -- because they are presented to the court as law, not to the jury as evidence. See John W. Strong, McCormick on Evidence § 335 (5th ed. 1999) ("The heavy-footed common law system of proof

_____

[12]The discussion above applies to judicial notice of "adjudicative" facts, not judicial notice of "legislative" facts. This distinction is not material in this case, but I summarize it briefly for purposes of completeness. "Adjudicative" facts, which are governed by Fed. R. Evid. 201, are "simply the facts of the particular case." Fed. R. Evid. 201(a) advisory committee's note. "Legislative facts," by contrast, include facts "which have relevance to legal reasoning and the lawmaking process, whether in the formulation of a legal principle or ruling by a judge or court or in the enactment of a legislative body." Id. For example, in Muller v. Oregon, 208 U.S. 412, 419-21 & n.1 (1908), the Supreme Court took judicial notice of extensive sociological research that supported shorter working hours for women in evaluating the rationality of statutes mandating such hours. Judicial notice of legislative facts is not governed by Rule 201. Fed. R. Evid. 201(a); Fed. R. Evid. 201(a) advisory committee's note.

-21-

by witnesses and authenticated documents is too slow and cumbrous for the judge's task of finding what the applicable law is."). In the federal system, "[t]he law of any state of the Union, whether depending upon statutes or upon judicial opinions, is a matter of which the courts of the United States are bound to take judicial notice, without plea or proof." Lamar v. Micou, 114 U.S. 218, 223 (1885); White v. Gittens, 121 F.3d 803, 805 n.1 (1st Cir. 1997).[13]

Although judicial notice of fact and judicial notice of law share the phrase "judicial notice," they draw on different rules of practice. Rule 201 "governs only judicial notice of adjudicative facts." Fed. R. Evid. 201(a). Judicial notice of law is outside the scope of Rule 201, and derives from practical considerations and case law that do not rely on Rule 201 or principles of evidence.[14]

---

[13]Within the federal court system, the doctrine of judicial notice of state court decisions also contains an element of federal-state comity, and federal courts occasionally distinguish their obligations from those of state courts, which in some cases require proof of sister state statutes or judicial decisions. See, e.g., In re Paramount Publix Corp., 85 F.2d 83, 86 (2d Cir. 1936).

[14]A footnote in White suggests in dictum that judicial notice of law emanates from Rule 201(b). See 121 F.3d at 805 n.1. However, this is not correct. The Advisory Committee specifically disclaimed any intent to address judicial notice of law because "the manner in which law is fed into the judicial process is never a proper concern of the rules of evidence but rather of the rules of procedure," and instead "suggest[ed] that those matters of law which . . . have traditionally been treated as requiring pleading and proof and more recently as the subject of judicial notice be left to the Rules of Civil and Criminal Procedure." Fed. R. Evid. 201 advisory committee's note. Rule 201, as it says in its very first sentence, "governs only judicial notice of adjudicative

Although this typology is easy enough to outline, nuances arise at the margins, and "[t]he exact parameters of judicial notice of state laws and regulations are rarely tested." In re Madeline Marie Nursing Homes, 694 F.2d 433, 446 (6th Cir. 1982). For instance, while a federal court must take judicial notice of state statutes "without plea or proof," Lamar, 114 U.S. at 223, courts traditionally were not required to take notice of local ordinances. Yet that tradition is eroding. A brief history of this exception to the general principle of judicial notice of law will clarify the issue presented in this case.

**B.        The Common Law Rule of Proof of Local Ordinances**

By longstanding tradition, a local ordinance was considered to be "not a public statute, but a mere municipal regulation; and, to make it available . . . it must be pleaded, like any other fact of which judicial notice will not be taken." Robinson v. Denver City Tramway Co., 164 F. 174, 176 (8th Cir. 1908); Gardner v. Capital Transit Co., 152 F.2d 288, 290 (D.C. Cir. 1945) (affirming trial court's refusal to take judicial notice of or instruct jury regarding District of Columbia ordinance that appellant had not proven, because "municipal ordinances may not be

---

facts," and certainly not judicial notice of law. Indeed, one organization has proposed a new Rule 203 to govern judicial notice of law, which would hardly be necessary if the topic fell under the heading of Rule 201. See Paul R. Rice, The Evidence Project: Proposed Revisions to the Federal Rules of Evidence with Supporting Commentary, 171 F.R.D. 330, 405 (1997).

judicially noticed by courts of general jurisdiction"); <u>Broughton</u> v. <u>Brewer</u>, 298 F. Supp. 260, 265-66 (S.D. Ala. 1969) (refusing to take judicial notice of ordinances and granting partial judgment for defendants because plaintiffs had failed to plead or introduce into evidence official or certified copies of ordinances); <u>McCormick on Evidence</u> § 335 & n.10; <u>ante</u> at 17-18.

This distinction in the treatment of state statutes and local ordinances was based on the historic reality that it was much easier for a court to obtain (and be confident that it had the correct version of) a state statute than a local ordinance.  <u>See</u> <u>Roden</u> v. <u>Conn. Co.</u>, 155 A. 721, 723 (Conn. 1931) ("The means to ascertain . . . what ordinances of a city are in effect at any particular time, without change or amendment, are certainly not reasonably available to the courts, and frequently they are not capable of ready and unquestionable demonstration.").[15]  "[W]hen the

---

[15]I cite state law cases only to illustrate trends in historic practice and the logic behind them.  Judicial notice is purely procedural and hence is governed by federal law. "A federal court sitting in diversity jurisdiction is obliged to apply federal procedural law and state substantive law."  <u>Alternative Sys. Concepts, Inc.</u> v. <u>Synopsys, Inc.</u>, 374 F.3d 23, 32 (1st Cir. 2004); <u>Hanna</u> v. <u>Plumer</u>, 380 U.S. 460, 465 (1965); <u>Erie R.R.</u> v. <u>Tompkins</u>, 304 U.S. 64, 78 (1938).  Indeed, if judicial notice in federal court were subject to state law, then <u>Lamar</u> would be superfluous where state law provided for judicial notice of state statutes, and violate <u>Erie</u> where state law did not so provide.
    Consequently, I do not believe that the Rhode Island rule against taking judicial notice of a municipal ordinance, <u>see</u> <u>Town of Lincoln</u> v. <u>Cournoyer</u>, 186 A.2d 728, 730 (R.I. 1962), would apply in federal court even if this case involved a municipal ordinance instead of a document incorporated by reference into a state statute.  <u>Contra</u> <u>H. Wayne Palmer & Assocs.</u> v. <u>Heldor Indus.</u>, 839 F.

-24-

source-material <u>was not easily accessible to the judge</u>, as in the case of . . . city ordinances, law [was historically] treated as a peculiar species of fact, requiring formal proof." <u>McCormick on Evidence</u> § 335 (emphasis added). Indeed, Professor McCormick acknowledged the possibility that local ordinances might in some cases be "easily accessible to the judge," and anticipated that "[t]o the extent that these items become readily available in compilations, it may be expected that they will become subject to judicial notice." <u>Id.</u> Failing that, however, he suggested that "it would appear appropriate for judges to take judicial notice of . . . municipal ordinances if counsel furnish a certified copy thereof." <u>Id.</u>[16]

In other words, the rationale for excluding local ordinances from the <u>Lamar</u> principle (by which federal courts <u>must</u>

---

Supp. 770, 775 (D. Kan. 1993) (stating that judicial notice would be governed by Kansas judicial notice procedure); <u>Monk</u> v. <u>City of Birmingham</u>, 87 F. Supp. 538, 539 (N.D. Ala. 1949) (taking judicial notice of city ordinance, relying, without discussion, on Alabama statute that directed state courts to do so), <u>aff'd</u>, 185 F.2d 859 (5th Cir. 1950).

[16]The Evidence Project's proposed Rule 203 goes a step further by eliminating the requirement of a certified or official copy: "The court shall take judicial notice of ordinances . . . and similar sources of law of political subdivisions of the States or Territories of the United States if requested by a party <u>and supplied with the necessary material</u>." Proposed Fed. R. Evid. 203(b)(3), in <u>The Evidence Project</u>, 171 F.R.D. at 406 (emphasis added). Proposed Rule 203(b)(3) also allows the court to take judicial notice of such ordinances, even without submission by counsel, if the materials are "reasonably available to the court." <u>Id.</u>

take judicial notice of state statutes) is derived entirely from the practical difficulty of obtaining authentic and accurate copies of those ordinances.  If the proponent of an ordinance cures that difficulty by providing a certified copy of the actual ordinance, the court should, in my view, take judicial notice of it.  The fundamental concern underlying citation of local law to a federal court is whether the document offered by the proponent accurately states the law.  If there is no doubt that a document accurately states the law, there is no reason to eschew judicial notice of that law.[17]

## C.      Basic Principles of Judicial Notice of Law

Professor McCormick's pragmatic analysis sets forth the basis for applying the judicial notice of law doctrine to other contexts beyond local ordinances.  Without acknowledging it (and perhaps without even thinking about it) courts take judicial notice

---

[17]I have carefully framed the issue of judicial notice of law in terms of both "accuracy" and "authenticity" because a focus on authenticity alone could be misleading.  Authenticity simply means that the document is what its proponent says it is.  See generally Fed. R. Evid. 901-02.  If the legal material submitted is in fact a copy of the ordinance as actually issued by the municipal authority, authenticity is probably the only issue.  If, however, the document submitted is excerpted from a web page, a legal research service, or some other non-official source, the question of authenticity -- whether the document submitted is what it purports to be -- is eclipsed by the more important question of whether the document submitted accurately relates the law as set forth by the enacting authority.  In other words, such secondary materials introduce a hearsay problem; evidence that a page of regulations included in a brief was, in fact, printed from a certain web site is probably not helpful in determining whether the web site accurately stated the law.

of law every time they cite a statute or judicial decision. See 29 Am. Jur. 2d Evidence § 136 ("A court takes judicial notice of a litigation document as a source of law when it follows a decision of [a] superior court, cites a court decision as precedent, or relies upon it as persuasive authority."). As a practical matter, in most cases, this law-gathering process flows smoothly without invoking the machinery of judicial notice because there is usually no doubt about what the law actually says.[18]  Theoretically, however, questions of authenticity and accuracy lurk below the surface whenever a court refers to a document to establish the law -- even when that document is the Federal Reporter or the United States Code.  After all, the publishers or codifiers might have released an incorrect version of the underlying judicial decision or Congressional enactment.  In reality, however, authenticity and accuracy are never doubted when these widely-available, well-respected services are cited.  In the language of Rule 201 (which provides a useful reference point even though it does not apply to judicial notice of law), the accuracy of these sources "cannot reasonably be questioned." The situation may differ, however, when the district court is presented with a document purporting to represent an ordinance of a small New England town.  Authenticity and accuracy -- which are almost never at issue with federal or state statutes -- can sometimes present real concerns with local

---

[18]What the law means, of course, is often disputed.

ordinances. "[S]tate statutes are compiled, published and distributed by recognized professional entities who must vouch for the integrity of their product and thus they are likely accurate, readily ascertainable and available while such is often not the case with ordinances." Keyes v. Amundson, 391 N.W.2d 602, 608 (N.D. 1986).[19]

The pragmatic underpinnings of the judicial notice of law doctrine provide the appropriate guides for analysis of the

---

[19]Authenticity and accuracy can also sometimes present real concerns with state administrative regulations. Federal courts and most state courts take judicial notice of such regulations. See, e.g., Roemer v. Bd. of Pub. Works, 426 U.S. 736, 742 n.4 (1976) (taking judicial notice of state regulation); Nat'l Agric. Chems. Ass'n v. Rominger, 500 F. Supp. 465, 472 (E.D. Cal. 1980) (same, though incorrectly suggesting that Rule 201 might be involved); see also Norman J. Singer, 2 Sutherland on Statutory Construction § 39:4 n.1 (6th ed. 2000) (collecting state cases); 29 Am. Jur. 2d Evidence § 122 n.98 (2003) (same). Some of the state courts that decline to take judicial notice of their own state's administrative regulations have cited the same practical considerations of accessibility that grounded the traditional refusal to judicially notice ordinances. See, e.g., Dairyland Power Coop. v. State Bd. of Equalization & Assessment, 472 N.W.2d 363, 368 (Neb. 1991) ("[B]ecause establishing the existence and contents of a particular administrative rule or regulation at any given time is often a difficult and uncertain process, it is an established principle that, as a general rule, this court will not take judicial notice of such rules or regulations.") (internal quotation marks omitted); see also Madeline Marie Nursing Homes, 694 F.2d at 446 (noting that Ohio administrative regulations were not published until 1976, and consequently there was "no readily available source from which [the] court [could] independently ascertain the exact status of the Ohio regulations in effect in 1976 and earlier"); McCormick on Evidence § 335 ("State and national administrative regulations having the force of law will also be noticed, at least if they are published so as to be readily available.") (emphasis added). Federal regulations, by contrast, must be judicially noticed under the Federal Register Act. See 44 U.S.C. § 1507.

-28-

district court's handling of NFPA 30, the fire code relied on by Capital. Chief among those underpinnings are convenience and practicality. A court cannot take notice of a code that it cannot find, even if that code is incorporated by reference into a state statute. At the same time, rules of thumb that distinguish, for example, a "mere municipal regulation" from a somehow more worthy state statute, Robinson, 164 F. at 176, should not be fetishized if the municipal materials are made available by commonly used legal research services or by a party. Rather, the doctrine of judicial notice of law must be applied with a focus on the availability of the materials at issue. Where documents that establish the relevant law are readily available by ordinary legal research from a citation provided by a party, or copies of the relevant documents are actually submitted, the court would be authorized, in my view, and in most cases required, to take judicial notice of that law, whether it is found in statutes, regulations, executive orders, ordinances, so-called "private" laws, charters, privately developed standards adopted into law, or comparable documents. By contrast, where documents are neither readily available -- as is still often the case with such materials -- nor actually submitted, a court need not take judicial notice of something that it cannot obtain.[20]

---

[20]This approach parallels, in some important respects, the process that federal courts use to determine foreign law. "In general, foreign law is treated as a fact that must be proven by the parties." Abdille v. Ashcroft, 242 F.3d 477, 489 n.10 (3d Cir. 2001). However, the Federal Rules of Civil Procedure provide a

**D.          Judicial Notice of Safety Codes**

The principles set forth above are instructive in analyzing the theory and practice underlying the choice between proof or judicial notice of building, fire, and electric codes. These codes often present the same ease-of-access issues as municipal ordinances.  But they also a introduce a new variable: whether the safety code is simply a voluntary industry standard, or legally binding state or local law.

1.     Voluntary Industry Standards

Many cases involve voluntary industry standards that do not have the force of law in the relevant jurisdiction.  The overwhelming majority of such cases are negligence actions where the industry standard is offered as evidence of the appropriate standard of care. See, e.g., Miller v. Yazoo Mfg. Co., 26 F.3d 81, 83 (8th Cir. 1994) (in personal injury action, American National Standards Institute lawnmower safety standards were offered to establish standard of care); Matthews v. Ashland Chem., Inc., 770 F.2d 1303, 1310-11 (5th Cir. 1985) (in personal injury action, NFPA, National Electric Code, and the American National Standard Specifications for Accident Prevention Signs were offered to

---

more flexible approach that, in some instances, allows the court to determine foreign law without extensive and cumbersome factfinding procedures.  See Fed. R. Civ. P. 44.1.  The Advisory Committee explained that, while the court "may engage in its own research and consider any relevant material thus found," it is also "free to insist on a complete presentation by counsel."  Fed. R. Civ. P. 44.1 advisory committee's note.

establish standard of care); <u>Boston & Me. R.R.</u> v. <u>Talbert</u>, 360 F.2d 286, 290 (1st Cir. 1966) ("certain nationally recognized standards concerning the design of highway and railroad crossings" were offered to establish standard of care, with trial judge's warning that they were "not completely authoritative"); <u>Dickie</u> v. <u>Shockman</u>, No. A3-98-137, 2000 WL 33339623, *3 (D.N.D. July 17, 2000) (in personal injury action, NFPA standards "and other codes applicable within the propane industry" were offered to establish standard of care).

These voluntary standards do not irrefutably establish the standard of care in a negligence case. Rather, they constitute "one more piece of evidence upon which the jury could decide whether the defendant acted as a reasonably prudent person in the circumstances of th[e] case." <u>Boston & Me. R.R.</u>, 360 F.2d at 290. The defendant is free to argue that the standard is unduly demanding, either in general or in the particular instance, and that it does not reflect industry practice or the standard that a reasonably prudent person would employ. After all, voluntary standards are not law; in essence, they are simply recommendations written by experts who may not themselves be available for cross-examination. In short, the merits of the standard are "for the jury's consideration like any other evidence in the case." <u>Id.</u>

Consequently, courts have generally treated such standards as factual evidence that the court may admit or exclude

based on ordinary evidentiary principles.  See, e.g., Miller, 26 F.3d at 83-84 (voluntary standard was properly admitted); Matthews, 770 F.2d at 1310-11 (voluntary standards were properly excluded); Boston & Me. R.R., 360 F.2d at 290 (voluntary standards were properly admitted); Dickie, 2000 WL 33339623, at *3 (admitting expert testimony regarding voluntary standards).  I believe that this practice is sound.

            2.      Legally Binding Safety Codes

        By contrast, many safety codes are enacted as municipal ordinances or state administrative regulations, and consequently have the force of law.  See, e.g., Burran v. Dambold, 422 F.2d 133, 135 (10th Cir. 1970) (New Mexico contractors' license board was "statutorily empowered to adopt a building code having the force of law and has done so"); Curtis v. District of Columbia, 363 F.2d 973, 974-76 (D.C. Cir. 1966) (District of Columbia Building Code was enacted by District's Commissioners); Am. States Ins. Co. v. Hannan Constr. Co., 283 F. Supp. 988, 996 (N.D. Ohio 1966) ("fire protection provisions of the Ohio Building Code [were] promulgated by the Board of Building Standards of the Ohio Department of Industrial Relations"), aff'd, 392 F.2d 171 (6th Cir. 1968) (per curiam).  Violating such codes could lead to an administrative citation, and may constitute negligence per se in some jurisdictions.  See, e.g., Perkinson v. Gilbert/Robinson, Inc., 821 F.2d 686, 692 (D.C. Cir. 1987) (District of Columbia); Burran, 422

-32-

F.2d 133 at 135-36 (New Mexico); Employers Fire Ins. Co. v. Laney & Duke Storage Warehouse Co., 392 F.2d 138, 140-41 (5th Cir. 1968) (Florida).

Many building, fire, electric, and other safety codes with the force of law were originally developed as industry standards by private nongovernmental entities and then adopted into law. Such privately-developed codes can be adopted into law in two different ways: directly or by reference. Direct adoption occurs when a model code is originally drafted by a nongovernmental body, but then incorporated wholesale (i.e., reproduced) into state or local law and promulgated (in its full text) as an ordinary statute or administrative regulation. See generally Building Officials & Code Adm'rs v. Code Tech., Inc., 628 F.2d 730, 732 (1st Cir. 1980) (explaining that Massachusetts Building Code, promulgated as state administrative regulation, was explicitly based on the Building Officials and Code Administrators (BOCA) Building Code, with only minor changes). Adoption by reference occurs when a government entity with the authority to enact a safety code promulgates an administrative regulation or ordinance that does not actually contain the text of the privately-developed standard, but rather incorporates it by reference. See R.I. Gen. Laws § 23-28.22-5 (requiring facilities dealing with flammable and combustible liquids to be "in accordance with N.F.P.A. Standard 30, 1987 edition"); Donovan v. Daniel Constr. Co., 692 F.2d 818, 820 n.2

(1st Cir. 1982) (federal Occupational Safety and Health Administration regulations required employers to install and use electrical facilities in accordance with National Electrical Code, NFPA, and other standards); Cal.-Pac. Utils. Co. v. United States, 194 Ct. Cl. 703, 781 n.7 (1971) (Nevada law required that power lines be maintained in accordance with standards of National Electrical Safety Code).

The cases reveal that the practices for placing legally binding state or local safety regulations into a case are undergoing a historic shift. In older cases from the 1950s and 1960s, courts generally treated state and local safety regulations as evidence for the jury, subject to the ordinary rules of evidence. See Stemple v. Phillips Petroleum Co., 430 F.2d 178, 180, 182-83 (10th Cir. 1970) (treating NFPA standards adopted by state fire marshal as evidence); Burran, 422 F.2d at 135 n.3 (New Mexico building code "was introduced in evidence without objection"); Laney & Duke Storage Warehouse Co., 392 F.2d at 139 ("'Portions of the Ordinance Code of the City of Jacksonville and portions of the Florida Fire Prevention Code were introduced in evidence . . . .'") (quoting jury instructions); Curtis, 363 F.2d at 974-75 (District of Columbia Building Code was offered into evidence but improperly excluded); Hannan Constr. Co., 283 F. Supp. at 997 ("Ohio Building Code [was] received in evidence"). Those cases do not explain why the courts treated law as evidence.

Rather, they simply assume the propriety of that approach. Indeed, it is probably safe to guess that counsel did not even request judicial notice.[21]

As Professor McCormick anticipated, however, more recent cases have reflected a shift in the treatment of state and local safety codes. Beginning around 1970, courts have slowly shifted from treating these codes as evidence to treating them as law that must be placed into a case by judicial notice rather than proof. See Cal.-Pac. Utils. Co., 194 Ct. Cl. at 781 n.7 (taking judicial notice of relevant standards of National Electrical Safety Code, which was incorporated by reference into Nevada law). The change has not always been smooth or steady, and some cases reveal ambivalence, or even confusion, regarding the proper treatment of such codes. See Perkinson, 821 F.2d at 688 & n.1;[22] United States v. Holley, 493 F.2d 581, 583-84 & n.3 (9th Cir. 1974) (appellant

_____

[21]An exception that perhaps proves the rule is Pub. Hous. Admin. v. Bristol Township, 146 F. Supp. 859, 866 n.5 (E.D. Pa. 1957). There, the proponent of a local building code submitted exhibits containing the entire code, but for some reason only formally offered certain portions into evidence. For eminently practical reasons, the court took judicial notice of the remainder.

[22]In Perkinson, the trial court apparently excluded plaintiff's evidentiary proffer of the District of Columbia Building Code, and instead stated that it would take judicial notice of the Code. At the close of trial, the defendant argued that the plaintiff "waived her right to have the regulations considered by the jury because she failed to put them in evidence." After a defendant's verdict, the trial court admitted that it had "put plaintiff's counsel off-guard by offering to take judicial notice of the regulations" and granted the plaintiff's motion for a new trial. 821 F.2d at 688 & n.1.

-35-

had sought to introduce into evidence an extract, the authenticity of which was not challenged, from county regulatory code; Court of Appeals expressly declined to address "the propriety of the practice of admitting extracts from local statutes or ordinances into evidence vis-a-vis the taking of judicial notice by the Court of such laws," because appellant had made no request for judicial notice); cf. Bryant v. Liberty Mut. Ins. Co., 407 F.2d 576, 579-80 & n.2 (4th Cir. 1969) (collecting cases on both sides of "the ancient rule of the common law that courts may not take judicial notice of municipal ordinances"). Illustrating the ongoing confusion in this area, the Tenth Circuit changed positions three times in a fifteen-year period before finally deciding that a court may take judicial notice of local ordinances. See Melton v. City of Oklahoma City, 879 F.2d 706, 724 & n.25 (10th Cir. 1989) (court may take judicial notice of local ordinances), vacated on other grounds, 928 F.2d 920 (10th Cir. 1991) (en banc); Ruhs v. Pac. Power & Light, 671 F.2d 1268, 1273 (10th Cir. 1982) (no judicial notice of local ordinances); Allred v. Svarczkopf, 573 F.2d 1146, 1151 (10th Cir. 1978) (taking judicial notice of local ordinances); Dewell v. Lawson, 489 F.2d 877, 879 (10th Cir. 1974) (no judicial notice of local ordinances). As time progresses, however, the view that state or local safety codes must be proven as evidence is being overtaken by the view that these codes should be judicially

noticed.  This evolution has proceeded much as Professor McCormick envisioned:

> [W]hen the source-material was not easily accessible to the judge . . . law has been treated as a peculiar species of fact, requiring formal proof. . . . [A]s these materials become more accessible, the tendency is toward permitting the judges to do what perhaps they should have done in the beginning, that is, to rely on the diligence of counsel to provide the necessary materials, and accordingly to take judicial notice of all law.  This seems to be the goal toward which the practice is marching.

McCormick on Evidence § 335.  In particular, the Seventh and Tenth Circuits have abandoned the old distinction between state statutes and local ordinances, and held that courts may take judicial notice of ordinances upon an adequate submission.  See Melton, 879 F.2d at 724 & n.25; Newcomb v. Brennan, 558 F.2d 825, 829 (7th Cir. 1977) ("We hold that matters of public record such as state statutes, city charters, and city ordinances fall within the category of 'common knowledge' and are therefore proper subjects for judicial notice."); see also Holst v. Countryside Enters., Inc., 14 F.3d 1319, 1322 n.4 (8th Cir. 1994) ("[I]t would not be appropriate to prove the fire code by the testimony of the expert architect. Ordinarily, codes, regulations, and statutes are, if relevant, established through judicial notice.").

Thus, the evolving trend in the law is that mandatory safety codes (like local ordinances or state administrative regulations in general) are, when feasible, established by judicial

notice, not by witness testimony or other factual proof. The rationale for requiring such codes to be offered into evidence and proven -- the practical difficulty of obtaining the necessary materials -- has been undermined by developments in technology and open government practices that often make it easier to find the relevant law.[23] Cf. Madeline Marie Nursing Homes, 694 F.2d at 446 (noting that Ohio administrative regulations were not published until 1976, and consequently there was "no readily available source from which [the] court [could] independently ascertain the exact status of the Ohio regulations in effect in 1976 and earlier."). Furthermore, this trend is paralleled by a similar change of view in most state court systems.[24]

---

[23]I do not mean to suggest that state or local safety codes, local ordinances, and the like are always readily available. My point is that when they are readily available, the rationale for requiring them to be offered into evidence and proven to the jury is undermined.

[24]See, e.g., Hawthorne Sav. & Loan Ass'n v. City of Signal Hill, 23 Cal. Rptr. 2d 272, 275 n.2 (Cal. Ct. App. 1993) (taking judicial notice of municipal code and of Uniform Code for the Abatement of Dangerous Buildings); Jimenez v. Hawk, 683 A.2d 457, 460 (D.C. 1996) (trial court took judicial notice of D.C. Fire Code); Rothstein v. City Univ. of N.Y., 599 N.Y.S.2d 39, 40 (N.Y. App. Div. 1993) (trial court took sua sponte judicial notice of city building code); Commonwealth v. Marcus, 690 A.2d 842, 844-45 (Pa. Commw. Ct. 1997) (trial court took judicial notice of BOCA Building Code, adopted by town ordinance); Hernandez v. Houston Lighting & Power Co., 795 S.W.2d 775, 776-77 (Tex. App. 1990) (trial court properly took judicial notice of the National Electric Safety Code after providing the opposition with an opportunity to rebut its accuracy); but see Childers v. Richmond County, 467 S.E.2d 176, 177 (Ga. 1996) (court cannot take judicial notice of city or county ordinances) (internal quotation marks omitted); Camara v. Bd. of Appeals, 662 N.E.2d 719, 720 (Mass. App. Ct. 1996)

In sum, the rationale for not judicially noticing local or state law other than public state statutes has largely eroded, and the evolution of the law points in this direction. In my view, when possible, local ordinances -- including safety codes that have the force of law -- should be placed into a case via the mechanism of judicial notice of law, not proof to the jury.

**E.       Capital's Burden**

Because judicial notice of law is a practical doctrine, the burden of production for the proponent of the law should depend largely on the nature of the legal materials and how readily they may be accessed by ordinary legal research methods. If the document may be accessed by a widely used electronic legal research service or found in the collection of any reasonably well stocked public law library, then (absent a local court rule to the contrary) a simple citation will almost always suffice.

Here, the materials were not so readily available. While R.I. Gen. Laws § 23-28.22-5 is a public state statute, readily retrievable by the simplest legal research and itself subject to judicial notice under <u>Lamar</u>, it is not fully specified. To fully understand what the statute requires, one must turn to NFPA 30, which is privately authored, published, and copyrighted. In respects relevant here, however, it does not differ from an unpublished ordinance or regulation: it is neither reproduced in

---

(court cannot take judicial notice of municipal zoning by-laws).

the Rhode Island statute books nor retrievable via commonly used legal research methods.

### 1. Unchallenged Copies

If Capital had provided the district court with a copy of NFPA 30 that had been certified by the state of Rhode Island as official, the court would have been required, in my view, to take judicial notice of it. NFPA 30 is, after all, part of the law of Rhode Island. In the presence of a certified copy of NFPA 30, I cannot imagine why it would be necessary or even helpful to prove its contents or authenticity in lieu of the court taking judicial notice of law. See generally Fed. R. Evid. 902(4) (certified copies of public records are self-authenticating); Ryan v. E.A.I. Constr. Corp., 511 N.E.2d 1244, 1252 (Ill. App. Ct. 1987) ("The court took judicial notice of the [Chicago Building C]ode after plaintiff tendered a certified copy to the court.").

If Capital had presented the district court with an uncertified copy, the analysis would be almost the same. Parties routinely submit copies of documents of law to federal courts, and certified copies are rarely required. If Capital had presented the district court with a copy of the 1987 edition of NFPA 30 that bore reasonable indicia of authenticity, the court would have been authorized to judicially notice it, after giving Getty Properties a reasonable opportunity to contest its authenticity and accuracy before the court. Cf. S. Pac. Co. v. De Valle Da Costa, 190 F.

689, 697-98 (1st Cir. 1911) (noting that "under ordinary circumstances, informality in proof of a general statute of one of the United States [is not] a sufficient ground for reversal by a United States court" if there is no actual dispute regarding the statute's contents). If the authenticity and accuracy of that uncertified copy of NFPA 30 were not contested, the court, in my view, would probably have been required to judicially notice it.

   2.   Challenged Copies

   If, on the other hand, there had been a genuine dispute about the authenticity and accuracy of a proffered copy,[25] I believe that the court -- not the jury -- would have been required to resolve that dispute. I recognize that traditional doctrine required the proponent to "prove" ordinances to the jury, see, e.g., Robinson, 164 F. at 176, which presumably would determine the law in case of a dispute. But this practice made little sense then and makes less sense now. Cf. Arthur John Keeffe, William B. Landis, Jr., & Robert B. Shaad, Sense and Nonsense About Judicial

--------

   [25]Such disputes do arise. See, e.g., H. Wayne Palmer & Assocs. v. Heldor Indus., 839 F. Supp. 770, 774-75 (D. Kan. 1993) (plaintiffs presented expert affidavit that fire code was adopted by city, but did not provide city ordinance that allegedly adopted code, and defendants insisted that fire code was never adopted by city); St. James Constr. Co. v. Morlock, 597 A.2d 1042, 1047 (Md. Ct. Spec. App. 1991) (appellant argued that trial court erred because it "took judicial notice of copies of . . . national building standards rather than the County Code itself, thereby making it difficult to determine whether and how the national building standards had been amended in their adoption by [the] County").

Notice, 2 Stan. L. Rev. 664, 674 (1950) (describing the view that determination of foreign law presents a jury question as a "ridiculous proposition" with "disastrous" results). There was a view that disputes about the authenticity, accuracy, and contents of documents were "factual," and factual disputes must be resolved on admissible evidence submitted to the jury. That view hangs too much importance on the abstraction of "fact" and not enough on the logical and institutionally optimal allocation of responsibility between the judge and the jury. See Norman J. Singer, 2 Sutherland on Statutory Construction § 39:7 (6th ed. 2000) ("'Proof' of the ordinance does not make it a fact; it only presents for judicial consideration a part of the law which may not be as available as other parts."); cf. Christopher B. Mueller & Laird C. Kirkpatrick, 1 Federal Evidence § 59 (2d ed. 1994) ("Sometimes, because a question of 'fact' was thought to be involved [in establishing foreign law], the proof was made to the jury, although the inappropriateness of having juries make determinations of law is now generally recognized.").

In my view, the judge, not the jury, should determine the governing law. "It would appear to be self-evident that it is peculiarly the function of the judge to find and interpret the law applicable to the issues in a trial and, in a jury case, to announce his findings of law to the jury for their guidance." McCormick on Evidence § 335. If factfinding is necessary to

ascertain the law, the judge should find the necessary facts and then instruct the jury:

> When a judge presiding in the presence of a jury decides a question of fact, a sufficiently unique event occurs to merit special treatment because the jury is thought to perform the factfinding role in common law countries. . . . There is nothing very remarkable about a judge ruling on the tenor of the law to be applied to the resolution of the controversy, however, because by definition this is the very function judges are supposed to perform.

Id.; see also Neuber v. Royal Realty Co., 195 P.2d 501, 517-518 (Cal. Ct. App. 1948) (trial court had refused to admit city ordinances into evidence but instead instructed jury as to what conduct would violate those ordinances; affirming and explaining that "it would seem to us just as improper to submit ordinances to the jury for interpretation as it would be to hand them a copy of the Civil Code for them to peruse in determining what the law of the state was"), overruled in part on other grounds, Porter v. Montgomery Ward & Co., 313 P.2d 854, 857 (Cal. 1957).[26]

_____

[26]The fact that the jury should not be called upon to decide the law has no impact on whether the jury may see the law. These are independent questions. Consider an ordinary statute. Typically, the judge instructs the jury on the law, and does not give jurors a copy of relevant statutes:

> In the orderly trial of a case, the law is given to the jury by the court and not introduced as evidence. It is the function of the jury to determine the facts from the evidence and apply the law as given by the court to the facts as found by them from the evidence. Obviously, it would be most confusing to a jury to have legal material introduced as evidence and then argued as to what the law

The superiority of this institutional allocation of responsibility between judge and jury is illustrated by what could have happened in this case if the jury had been required to determine the law. Suppose that Capital had provided the 2000 edition of NFPA 30 (which, in fact, it possessed) and a witness who would testify that the 1987 edition was materially identical, but that Getty Properties had disputed that assertion and provided a contrary witness. It would make little sense for the jury to decide what the law said, and then for the judge to instruct the jury on the law based on what the jury had just told the judge. Suppose, even more simply, that Capital had presented a certified, undisputed copy of NFPA 30 to the court, but the district court declined to take judicial notice and instead let the jury decide. But what exactly would the jury decide? Whether NFPA 30 is in fact part of the law of Rhode Island? Whether the certified, undisputed

---

is or ought to be.

United States v. Bernhardt, 642 F.2d 251, 253 (8th Cir. 1981) (quoting Cooley v. United States, 501 F.2d 1249, 1253-54 (9th Cir. 1974)). However, the judge has broad discretion to give the jurors copies of statutes for their deliberations, or decline to do so, as she sees fit. See United States v. Polizzi, 500 F.2d 856, 875-76 (9th Cir. 1974) (court sent statutes and regulations into jury room; no abuse of discretion because statutes and regulations were extremely complex and judge could justifiably believe that it would have been better to give jury the statutes and regulations rather than have the jury attempt a reconstruction from notes or from memory). If ordinary statutes, which are always subject to judicial notice, and should almost never be offered into evidence, can be given to the jury, then it follows that the trial court has the discretion to publish to the jury NFPA 30 or any other source of law, even though the law does not enter the case as "evidence."

copy presented in court accurately states NFPA 30 to the extent that it is part of the law of Rhode Island? Further suppose that the jury got the law wrong: would its decision be reviewable by an appellate court, and under what standard -- sufficiency of the evidence? The system works best when the judge conducts the necessary investigation and determines the law:

> In determining the content or applicability of a rule of domestic law, the judge is unrestricted in his investigation and conclusion. . . . He may make an independent search for persuasive data or rest content with what he has or what the parties present. He may reach a conclusion in accord with the overwhelming weight of available data or against it. If he is a trial judge, his conclusion is subject to review.

Edmund M. Morgan, Judicial Notice, 57 Harv. L. Rev. 269, 270 (1944).

3. Procedure for Invoking Judicial Notice

Capital's submission need not have been accompanied by a formal request for judicial notice of law. Rather, the question is whether the proponent has submitted material to the court (and to opposing parties) that effectively makes the judicial notice of law request. If the material is readily available or actually submitted in full to the court, the proponent need not formally request judicial notice of law; the submission of a readily retrievable citation, or of copies of the relevant documents, ought to suffice. See State Dep't of Highways v. Halvorson, 181 N.W.2d 473, 476 (Minn. 1970) ("Where a court is asked to take judicial

-45-

notice of an agency regulation . . . counsel should be prepared to exhibit to the court the relevant contents of the regulation, either by tendering a copy of the published regulation or by reference to some other readily available official report disclosing its contents.") (emphasis added); Commonwealth v. Marcus, 690 A.2d 842, 844-45 (Pa. Commw. Ct. 1997) (where counsel submitted a memorandum to trial court at beginning of the hearing, setting forth BOCA Code and ordinance sections, but did not submit an authenticated copy of the complete ordinance, "counsel fulfilled his obligation to aid the trial court in obtaining the relevant provisions of the Ordinance. Hence, the trial court properly took judicial notice of the Ordinance with the aid of the counsel . . . ."). By the same token, the mere fact that a proponent requests the court to judicially notice a body of law does not suffice if that law is neither readily available nor actually submitted.

District courts need not go to Herculean lengths to discover the law when counsel do not adequately present it. Rather, the court should have the discretion to determine whether the proponent's submission sufficiently enables the court to ascertain the law. Cf. Bello, 194 F.3d at 23 (reviewing trial court's decision to take judicial notice of adjudicative fact under Rule 201 for abuse of discretion). Under that standard, if the court cannot ascertain the law from counsel's submission, then,

-46-

virtually by definition, the submission is inadequate. Accordingly, the court need not judicially notice a document that was never presented to the court and that is not reasonably available by ordinary legal research. Cf. Holst, 14 F.3d at 1323 (affirming trial court's exclusion of cross-examination testimony regarding fire code; where party neither introduced fire code into evidence by direct testimony nor requested judicial notice of code, it was not before the court and could not be investigated in cross-examination or on re-direct); see also United States v. Buswell, 45 C.M.R. 742, 747 & n.3 (A.C.M.R. 1972) (reversing conviction where soldier was convicted of violating classified regulation, contents of which were not presented to military court, and noting that if the regulation were "physically available" to court, court "would not hesitate to take judicial notice of it," but without a copy of allegedly violated regulation, there was nothing to judicially notice, and therefore the charge failed to state an offense); Marcher v. Butler, 749 P.2d 486, 489 (Idaho 1988) ("offhand mention of building codes" in summary judgment memorandum "was insufficient to put the trial court on notice of them"); Plains Transp. of Kan., Inc. v. Baldwin, 535 P.2d 865, 871 (Kan. 1975) (appellants did not "make a sufficient presentation for the trial judge . . . . Essentially, the district court had nothing before it which justified or required the giving of [appellants' requested] instruction.").

**F.      Conclusion**

I summarize the principles of judicial notice of law that I have described here and then apply them to the district court's ruling on Getty's motion for judgment as a matter of law. Parties generally must identify the law that is essential to their case. No formal request for judicial notice of law need be made, but the relevant law must be provided to the court in a meaningful form. Where this law can be readily retrieved from a simple citation, providing that citation to the court will usually suffice. Where the law is difficult to obtain, the proponent must physically provide the court with a copy. A certified copy of the ordinance or other legal document will almost always suffice. An uncertified copy will suffice if it bears reasonable indicia of authenticity and there is no genuine dispute as to its accuracy. The court, not the jury, must resolve any such disputes. Finally, where the law is not readily obtainable and the proponent does not provide the court with any copy at all, the court may properly conclude that the proponent has not established the contents of that law.

Pursuant to its judicial notice of law request, Capital was required to make the 1987 edition of NFPA 30 -- which is not readily obtainable by ordinary legal research -- available to the district court. The court explicitly asked Capital to submit a copy of NFPA 30. Capital was unable to provide one. Therefore, I

join my colleagues' conclusion that the court was not required to take judicial notice of NFPA 30.  See ante at 18-19.

Ordinarily, a Rule 50(a) motion is based on a lack of evidence, not a lack of law.  In this breach of contract action, however, Capital claimed that the improvements were required by a "City, State, or Federal regulation[] applicable to the operation of the pipelines."  Since NFPA 30, through R.I. Gen. Laws § 23-28.22-5, was the only "regulation[] applicable to the operation of the pipelines" arguably involved in this case, and Capital did not provide an adequate basis for judicially noticing that standard, Capital failed to provide a "legally sufficient evidentiary basis for a reasonable jury to find" that the fire suppression equipment was required by any regulation.  See Fed. R. Civ. P. 50(a)(1).  Capital's failure to produce a copy of NFPA 30 was fatal to its case.  Therefore, I concur in the per curiam opinion affirming the district court.